JOEL D. HENRIOD (SBN 8492)
**LEWIS ROCA ROTHGERBER CHRISTIE LLP**
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169
jhenriod@lrrc.com
Telephone:  702.474.2681
Facsimile:  702.216.6190

MICHAEL B. HAZZARD (pro hac vice)
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, DC  20001-2113
mhazzard@jonesday.com
Telephone: (202) 879-3829
Facsimile: (202) 626-1700

*Attorneys for Defendant*
*TWILIO INC.*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **JEREMY BAUMAN, ET AL.,** | **Case No. 2:14-cv-01125-RFB-PAL** |
| *Plaintiff,* | |
| **v.** | **TWILIO INC.'S MOTION FOR SANCTIONS** |
| **DAVID SAXE, ET AL.,** | **Hearing Date:** |
| *Defendant.* | **Time:** |
| | **Department:** |
| | **Judge:**  The Honorable Richard F. Boulware, II |
| **BIJAN RAZILOU, ET AL.,** | **Action Filed:** July 9, 2014 |
| *Plaintiff,* | In consolidation with |
| **v.** | Case No.: 2:14-cv-01160-RFB-PAL |
| **V THEATER GROUP, LLC, ET AL.,** | |
| *Defendant.* | |

## I.      INTRODUCTION

The discovery record in this case contains clear evidence that Twilio is not liable under the Telephone Consumer Protection Act ("TCPA"), and Plaintiff's repeated filing of baseless allegations against Twilio should be sanctioned.  Plaintiff's and his counsel's disregard for the truth of Plaintiff's allegations demonstrate their disregard for Rule 11's requirement that they conduct a reasonable and competent inquiry into the evidentiary support for their factual allegations.

Twilio is a software company that offers its clients the ability to initiate texts and calls to cell phones anywhere in the world via a computer program.  Through its global cloud communications platform, Twilio is changing the way that some of the world's most reputable brands are communicating with third parties and their customers in real time.  Twilio's offerings enable over a million international companies—such as Coca-Cola, Netflix, Uber, Nordstrom, Twitter, The American Red Cross, and airbnb—to communicate with their customers anywhere in the world with a quality experience.  Twilio provides an application program interface ("API"): a set of protocols and tools for building software applications, that enable third-party software developers to create applications of their design to make and receive calls, videos, and text messages.  Twilio only provides its products to a pre-determined group of users—software developers—and not to the general public.  As Twilio's website makes clear, its API offers what are best described as programming "tools," which are not sold in a "ready for use" format.  Rather, Twilio's customers, and their software developers and programmers, must design and implement their individualized computer coding and data to tailor the basic API tools to their specific needs and preferences.  Twilio offers the building blocks for communications, but the third-party developers give their application life.

Despite Twilio's attenuated connection to the communications at issue in this litigation, Twilio has now been forced to defend itself against *two* of Plaintiff's complaints in this matter, both of which were entirely frivolous.  Twilio attempted to resolve this dispute amicably by communicating to

Plaintiff's counsel that the factual record in this case is devoid of any evidence of unlawful conduct by Twilio.  Indeed, the discovery record demonstrates Twilio could have no liability to Plaintiff as a matter of law and fact.  But Plaintiff's counsel wholly disregarded Rule 11's requirement that they ensure the veracity of Plaintiff's allegations before filing a complaint.  Plaintiff was therefore on notice that pursuit of a TCPA claim against Twilio had no basis in law or fact before filing his Second Amended Complaint.  Rule 11 sanctions are therefore not only warranted but necessary to deter any further baseless litigation against Twilio in this matter.

## II.      RULE 11(C)(1)(A) STATEMENT

Pursuant to Federal Rule of Civil Procedure 11(c)(1)(A), Twilio served a copy of this motion for Rule 11 sanctions upon counsel for Plaintiff on October 26, 2016.  Plaintiff and his counsel did not respond or otherwise attempt to cure their sanctionable conduct within the 21 days provided under the Rule.  Twilio accordingly filed this motion with the Court.

## III.     FACTUAL BACKGROUND

Plaintiff filed his initial complaint in this action on July 9, 2014.  In that complaint, Plaintiff named only the Saxe Defendants[1]; he did not include Twilio as a Defendant.  Plaintiff named Twilio as a defendant in his Amended Class Action Complaint ("Amended Complaint") on August 28, 2015, after almost a year of discovery had taken place.  (ECF #63).  Importantly, the Amended Complaint did not supplement or modify the allegations in Plaintiff's initial complaint to support Plaintiff's new claim of liability against Twilio.  Rather, Plaintiff simply added Twilio's name to the list of already named defendants.

In the Amended Complaint, Plaintiff broadly alleged that "defendants sent . . . [an] unsolicited SMS or 'text' message to Plaintiff[.]"  And Plaintiff claimed that "defendants made these calls . . .

---

[1] David Saxe, Saxe Management, LLC, David Saxe Productions, LLC, David Saxe Productions, Inc., V Theater Group, LLC, and Saxe Theater, LLC.

using an automatic telephone dialing system ('ATDS')."  However, in light of the legal requirements for TCPA liability and the discovery record at Plaintiff's disposal, these allegations against Twilio were entirely unjustified and devoid of any factual basis.  Accordingly, On September 6th, 2016, after oral argument on the matter, Judge Boulware, II granted Twilio's motion to dismiss Plaintiff's claims against Twilio, without prejudice.  (ECF #171).

On September 16, 2016, counsel for Twilio arranged a call with counsel for Plaintiff to discuss whether Plaintiff planned to file another Amended Complaint against Twilio.  Counsel for Twilio reiterated their position that there was no basis for including Twilio as a Defendant in this litigation and that, in light of the factual record, any additional claims against Twilio could only be brought in bad faith.  Indeed, the discovery record demonstrated that Twilio could have no liability as a matter of law or fact.  Counsel for Plaintiff, however, stated that they had additional "legal theories" under which they intended to pursue their claims against Twilio.  They also stated that they had additional documents in their possession that would support their claims against Twilio.  Twilio's counsel requested that Plaintiff's counsel share these documents, and Plaintiff's counsel agreed to send them. *See* September 16 Letter, attached as Exhibit A.

On September 20, 2016, Plaintiff filed his Consolidated Second Amended Class Action Complaint, again listing Twilio as a defendant.  (ECF #174).  On September 21, 2016, a full day *after* Plaintiff filed his Second Amended Complaint, Twilio received the documents from Plaintiff that allegedly supported Plaintiff's claims against Twilio.  Twilio reviewed these documents, but found no evidence to support Plaintiff's claims against Twilio in the Second Amended Complaint.   On September 22, 2016, Twilio sent Plaintiff a letter confirming its review of the documents, reiterating its position that there was no record evidence to support Plaintiff's claims against Twilio, and urging Plaintiff to seek dismissal of its claims against Twilio.  *See* September 22 Letter, attached as Exhibit B. As of the date of this motion, Plaintiff has not withdrawn his baseless allegations against Twilio that

he alleged in the Second Amended Complaint, and in fact, he has doubled down on all of these false allegations in his recently filed Response to Twilio's Motion to Dismiss.

## IV.    LEGAL STANDARD

Rule 11 of the Federal Rules of Civil Procedure "imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, legally tenable, and not interposed for any improper purpose." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, (1990).  The Rule is intended to deter baseless filings in district courts, and thus requires that any party making a representation to the court certifies that "the claims, defenses, and other legal contentions therein are warranted by existing law" and that "the allegations and other factual contentions have evidentiary support." Fed. R. Civ. P. 11(b).  If a party violates this rule, the court may "impose an appropriate sanction upon the attorneys, law firms, or parties that . . . are responsible for the violation."  Fed. R. Civ. P. 11(c)(1).  A sanction imposed for violation of this rule "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated," including "an order directing payment to the movant of part or all of the reasonable attorneys' fees and other expenses directly resulting from the violation."  Fed. R. Civ. P. 11(c)(4).

In the context of Rule 11 sanctions, the Ninth Circuit has held that an "attorney has a duty prior to filing a complaint not only to conduct a reasonable factual investigation, but also to perform adequate legal research that confirms whether the theoretical underpinnings of the complaint are warranted by existing law or a good faith argument for an extension, modification or reversal of existing law." *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002).  When a complaint is at issue in a Rule 11 motion "a district court must conduct a two-prong inquiry to determine (1) whether the complaint is legally or factually 'baseless' from an objective perspective, and (2) if the attorney has conducted 'a reasonable and competent' inquiry before signing and filing it." *Id.*   Therefore,

"[s]anctions under Rule 11 must be imposed upon litigants and counsel who file baseless papers without first conducting a reasonable and competent inquiry." *See Schutts v. Bentley Nevada Corp.*, 966 F. Supp. 1549, 1560 (D. Nev. 1997).  Plaintiff's and his counsel's behavior violates both prongs of Rule 11, and the Court should grant this motion.

## V.    ARGUMENT

Plaintiff's allegations against Twilio in his Second Amended Complaint are entirely unjustified. Plaintiff's insistence on filing a second baseless complaint against Twilio demonstrates disregard for Rule 11 and supports the imposition of sanctions.  Like his First Amended Complaint, Plaintiff's Second Amended Complaint contains allegations against Twilio that directly contradict Plaintiff's counsel's investigation.  As Plaintiff is well aware, to state a TCPA claim against Twilio, Plaintiff was required to allege:  (1) that Twilio initiated the text messages that Plaintiff received, or had a high degree of involvement in the making of the text; and (2) that Twilio used an Automatic Dialing System ("ATDS").  The record in this case does not support *any* of these requirements of a TCPA claim against Twilio.

*First*, any allegation that Twilio initiated the text messages at issue in this case is entirely unjustified, given the discovery record Plaintiff had at its disposal.  The FCC has made abundantly clear that only the initiators of calls or text messages are liable under the TCPA, "not [the party] that transmits the call or messages and that is not the originator or controller of the content of the call of the message." 47 U.S.C. § 227 (b)(1)(A).  On June 5, 2015—prior to Plaintiff's filing of the First Amended Complaint—Plaintiff took the deposition of Richard Schaaf, the Internet Marketing Manager for David Saxe Productions, LLC.  (*See* ECF #109-3, hereinafter "Schaaf Dep.").   This

deposition could have left no doubt in a reasonable person's mind that Twilio is not an initiator as defined by the FCC.[2]

In his deposition, Mr. Schaaf testified that he was responsible for determining what content went into the script of the text message communications that he sent on behalf of Defendant Saxe Productions, LLC—the same text communication that Plaintiff allegedly received.  (Schaaf Dep. 55). Mr. Schaaf made clear that Twilio did not help him to draft or design the content of the communications; instead, he stated that the extent of Twilio's involvement was the "sample script" Mr. Schaaf found on the Twilio website.  (Schaaf Dep. 66).  Mr. Schaaf stated that he had the ultimate control to decide what would be included in the scripts (Schaaf Dep. 60), and he determined what phone numbers would receive the text messages (Schaaf Dep. 52).  Indeed, Mr. Schaaf's testimony served only to confirm that Twilio did not "initiate" the text messages.  Although Twilio's API gives third party users the instrument through which they can smoothly coordinate communications, Twilio is certainly not controlling, designing, or initiating the texts or calls made by users like Uber, airbnb, or its other customers.

Moreover, even if Plaintiff were to pursue a "transmitter" theory of initiation against Twilio, Mr. Schaaf's deposition also demonstrated that Twilio did not exhibit "a high degree of involvement" in the making of the calls, as is required to support TCPA liability where the defendant is merely a transmitter of communications.  *Rinky Dink v. Elec. Merch. Sys.*, Civ. No. 13-1347-JCC, 2015 WL 778065 (W.D. Wash. Feb. 24, 2015).  On the contrary, the deposition testimony revealed evidence that Twilio was *not at all* involved in the selection of recipient phone numbers, assembly of the communication script, or timing of the messages' initiation.  Indeed, Mr. Schaaf stated that he did not know much about Twilio nor what the company even does.  (Schaaf Dep. 53-60).  Further, he stated that he had limited interaction with Twilio and only spoke to a Twilio representative *on one occasion*

---

[2] Relevant excerpts of Mr. Schaaf's deposition are attached to this motion as Exhibit C.

during his time working to design the communications at issue.  (Schaaf Dep. 66).  Twilio was clearly not "highly involved" in the design or initiation of the messages.  Crucially, the Twilio platform must be programmed and enlivened by clients to reach their desired recipients in the preferred time and method.  As Twilio made clear to Plaintiff, no construction of the discovery record could plausibly show that Twilio has TCPA liability.  *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Declaratory Ruling and Order, 30 FCC Rcd. 7961, (rel. Jul. 10, 2015) (hereinafter "*TCPA Declaratory Ruling*"); *Kauffman v. Callfire, Inc.*, 141 F. Supp. 3d 1044, 1048 (S.D. Cal. Oct. 7, 2015) (an internet-based communication platform cannot be an "initiator" when it "requires its users to take affirmative steps to determine whether, when, and to whom they should send text messages," and its customers have to "create their own telephone contact lists"); *See* September 22 Letter, attached as Exhibit B.

Plaintiff also has not provided a single factual allegation to support a theory that Twilio was so highly involved in the sending of the texts at issue here that it could be deemed to be an initiator.  The FCC has made clear that a software application provider, like Twilio, is not an "initiator" where "the app user determines whether to send the . . . text messages," and the platform provider "*does not control* the recipients, timing, or content" of the messages.  *TCPA Declaratory Ruling* at 7978 ¶ 25.  In other words, when a provider like Twilio "exercises no discernible involvement in deciding whether, when, or to whom [a message] is sent, or what [the message] says," there is no TCPA liability.  *Id.* at 7891 ¶ 32.  Here, the only relevant allegation Plaintiff made regarding Twilio in *any* of his pleadings is that Twilio "transmitted nearly 300,000 text messages" and that Twilio "helped by providing some of the code for each of the scripts."  Plaintiff's Resp. to Mot. for Partial Summary Judgment, at 4.  But during Mr. Schaaf's deposition, counsel for Plaintiff directly asked Mr. Schaaf:  "Twilio helped you write the script?" and Mr. Schaaf responded:  "No." (Schaaf Dep., 54).  In fact, Mr. Schaaf noted that part of a script could be found on Twilio's website but that he did not "recall if it was their website

directly or not." (Schaaf Dep., 55).   Regardless, Mr. Schaaf, the user of the API services, took "affirmative steps" to design and send the messages.  He stated that he used "Control C, control V" to cut and paste Twilio's portion of the script into the script he used.  (*Id.*).   Moreover, significant portions of Mr. Schaaf's deposition reveal the large extent of his software coding, script design, and personal integration.  (*See generally* Schaaf Dep., 100-120).  Plaintiff therefore has no basis in law or fact for alleging that Twilio initiated the messages at issue here.

*Second*, Plaintiff did not—and cannot—sufficiently allege that Twilio used an ATDS.  Plainly pleading that an ATDS was used, without more, is insufficient to state a TCPA claim upon which relief can be granted. *See Weisberg v. Stripe, Inc.*, No. 3:16-cv-00584 (N.D. Cal. July 25, 2016), Order Granting Motion to Dismiss (dismissing a complaint that "plainly alleges that the text messages were sent using an ATDS that has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator" because plaintiff "has not plausibly alleged that the text messages were sent randomly to him by an ATDS").  Further, courts have noted that factual evidence suggesting that messages have not been sent "en masse to randomly or sequentially generated numbers" defeats insufficiently plain allegations of ATDS use. *Duguid v. Facebook, Inc.*, No. 15-cv-00985-JST, 2016 WL 1169365, *5 (N.D. Cal. Mar. 24, 2016).  Here, not only has Plaintiff failed to sufficiently allege Twilio used an ATDS, but the record makes clear that, to the extent an ATDS was used, it was not used by Twilio.  In Mr. Schaaf's deposition, he testified that, after designing each script for each individual message, he sent them for transmission "one by one by one to Twilio."  (Schaaf Dep., 140). Schaaf's individualized submission of messages for transmission therefore plainly does not constitute the "en masse" or "bulk" communications associated with ATDS.

Plaintiff and his counsel were both well aware of the factual deficiencies in Plaintiff's claims against Twilio before filing the First Amended Complaint, and Twilio's counsel reiterated to Plaintiff's counsel on two occasions that filing a Second Amended Complaint against Twilio could

only be done in bad faith.  *See, e.g.*, September 22 Letter, attached as Exhibit B.  Further, the most recent documents counsel for Plaintiff sent to Twilio served only to confirm the complete absence of evidentiary support for Plaintiff's claims against Twilio.  In fact, these documents directly undermined Plaintiff's counsel's statements during the September 16, 2016 phone call that the documents would support new "legal theories" against Twilio.  Plaintiff's and his counsel's knowing disregard for the veracity of the claims alleged against Twilio in the Second Amended Complaint warrant the imposition of Rule 11 Sanctions against both Plaintiff and his attorneys.

Indeed, the Ninth Circuit—and the District of Nevada—have imposed, and affirmed the imposition of, Rule 11 sanctions where a party, as here, filed claims that the party knew to be unsupported by the factual record.  *See, e.g., Bus, Guides, Inc. v. Chromatic Commc'ns Enterprises, Inc.*, 892 F.2d 802, 811 (9th Cir. 1989), aff'd, 498 U.S. 533 (1991) (if a claim "provides false facts, or provides facts that the client should have known were false, then the client should be sanctioned"); *Seare v. St. Rose Dominican Health Found.*, No. 2:10-CV-02190-KJD, 2011 WL 5101972, at *2 (D. Nev. Oct. 25, 2011) (imposing Rule 11 sanctions because an attorney's filing of "an amended complaint based upon knowingly false information violates the provisions of Rule 11 and constitutes bad faith in instituting and conducting litigation").  Plaintiff's allegations against Twilio are patently unsupportable as a matter of law and are contradicted by the discovery record.  As counsel for Twilio warned counsel for Plaintiff, such allegations could only have been presented for an improper purpose.  By filing a meritless Second Amended Complaint against Twilio, Plaintiff and his counsel directly undermined Rule 11's requirement that a party ensure his claims are supported by existing law and that his factual contentions have evidentiary support.  *See Wick v. Twilio Inc.*, No. C16-00914RSL, 2016 WL 6460316, at *4 (W.D. Wash. Nov. 1, 2016) (dismissing plaintiff's first amended complaint against Twilio, and warning that plaintiff may file a second amended complaint only if he "believes he can, *consistent with his Rule 11 obligations*, amend the complaint to remedy the pleading and legal

deficiencies" (emphasis added)).   This Court should accordingly impose appropriate sanctions on Plaintiff and his counsel to remedy their blatant violation of Rule 11.

## VI.   REQUESTED RELIEF

Rule 11 provides that the Court may order "payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation" if "warranted for effective deterrence." Fed. R. Civ. P. 11(C)(2).  Because Plaintiff's Second Amended Complaint, on its face, itself violates Rule 11, all fees and costs incurred by Twilio in responding to that Second Amended Complaint are a direct result of that violation.   This Court may accordingly impose sanctions covering the full cost of Twilio's attorneys' fees and costs incurred in drafting Twilio's Motion to Dismiss the Second Amended Complaint and this motion for sanctions.  *See Schutts,* 966 F. Supp. at 1560 ("Moreover, under Rule 11, a violation may warrant imposition of fees covering the entire course of the litigation if the complaint was filed in violation of the Rule.").

## VII.   CONCLUSION

For the reasons set forth above, Defendant Twilio Inc. respectfully requests that this Court grant Twilio's motion for Rule 11 sanctions against Plaintiff Jeremy Bauman and his counsel (Albert H. Kirby, Candice Renka, and Phillip S. Aurbach), dismiss Plaintiff's claims against Twilio with prejudice, award Twilio reasonable attorneys' fees and costs incurred in responding to Plaintiff's Second Amended Complaint, and issue whatever additional sanctions this Court deems appropriate.

Dated:  November 16, 2016              Respectfully submitted,

                                       /s/ Joel Henriod
                                       JOEL D. HENRIOD (SBN 8492)
                                       jhenriod@lrrc.com
                                       LEWIS ROCA ROTHGERBER CHRISTIE LLP
                                       3993 Howard Hughes Parkway, Suite 600
                                       Las Vegas, Nevada 89169
                                       Telephone:  702.474.2681
                                       Facsimile:  702.216.6190

MICHAEL B. HAZZARD (pro hac vice)
mhazzard@jonesday.com
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, DC  20001-2113
Telephone: (202) 879-3829
Facsimile: (202) 626-1700

Counsel for Defendant
TWILIO INC.

1

2

## <u>CERTIFICATE OF SERVICE</u>

3

I hereby certify that on this 16th day of November, 2016, I caused the foregoing to be electronically

4

filed with the Clerk of Court using the CM/ECF system, causing it to be served upon Plaintiff's counsel,

5

Albert H. Kirby, Candice Renka, and Phillip S. Aurbach and to be served on all registered users.

6

7

Respectfully submitted,

8

9

*/s/  Gabriela Mercado*_____

Employee of  LEWIS ROCA ROTHGERBER CHRISTIE LLP

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A



# MARQUIS AURBACH COFFING

DIRECT LINE: (702) 207-6075
DIRECT FAX: (702) 856-8943
EMAIL: CRENKA@MACLAW.COM

ALBERT G. MARQUIS
PHILLIP S. AURBACH
AVECE M. HIGBEE
DALE A. HAYES
TERRY A. COFFING
SCOTT A. MARQUIS
JACK CHEN MIN JUAN
CRAIG R. ANDERSON
TERRY A. MOORE
GERALDINE TOMICH
NICHOLAS D. CROSBY
JASON M. GERBER
MICAH S. ECHOLS
BRIAN R. HARDY
TYE S. HANSEEN
LIANE K. WAKAYAMA
CANDICE E. RENKA
DAVID G. ALLEMAN

CODY S. MOUNTEER
CHAD F. CLEMENT
BENJAMIN T. AUTEN
CHRISTIAN T. BALDUCCI
VINCENT J. VITATOE
BRIANNA SMITH
JARED M. MOSER
JONATHAN B. LEE
ADELE V. KAROUM
MICHAEL D. MAUPIN
PATRICK C. MCDONNELL
BRYAN M. VIELLION
KATHLEEN A. WILDE
NEIL M. SANSONE

JOHN M. SACCO
OF COUNSEL

September 16, 2016

*Via Regular Mail*
Michael Brian Hazzard, Esq.
Jones Day
51 Louisiana Ave. NW
Washington, DC 20001

Re:    Jeremy Bauman v. V Theater Group, LLC, et al.
       Our File No. 13700-1

Dear Mr. Hazzard:

Enclosed per your request, please find a DVD containing all non-confidential discovery documents produced in the above referenced matter as well as the deposition transcripts. Please note that the Saxe Defendants have produced items marked "confidential" and that these items have not been included in the attached DVD. If you require these items, please contact their counsel to obtain these documents. If you have any questions, please do not hesitate to contact our office.

Sincerely,

MARQUIS AURBACH COFFING

Julia Rodionova, Assistant To
Candice E. Renka, Esq.

CER:jr

cc:    Albert H. Kirby, Esq. (*Via Email: ahkirby@soundjustice.com*)

Enclosure:  CD Containing All Non-Confidential Produced Discovery and Deposition Transcripts.

MAC:13700-001 2898088_1 9/16/2016 2:27 PM

10001 Park Run Drive • Las Vegas, NV 89145 • Phone 702.382.0711 • Fax 702.382.5816 • maclaw.com



# Exhibit B

# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001.2113

TELEPHONE: +1.202.879.3939 • FACSIMILE: +1.202.626.1700

Direct Number:  (202) 879-5439
mhazzard@JonesDay.com

September 22, 2016

**BY ELECTRONIC AND US MAIL**

Albert H. Kirby
Sound Justice Law Group, PLLC
946 N 34th St., Ste. 300
Seattle, WA 98103

Re: *Bauman v. Saxe Management LLC et al, Docket No. 2:14-cv-01125 (D. Nev.)*

Dear Mr. Kirby:

Thank you for taking the time to talk with us over the phone last week, and we appreciate you sending us the discovery documents you referenced during that call.  We have reviewed the documents you sent us, however, and they serve only to confirm our stated position that Mr. Bauman has no claim against our client, Twilio Inc. ("Twilio"), and there is thus no basis for keeping Twilio in this case.

On September 6th, 2016, after oral argument on the matter, Judge Boulware granted Twilio's motion to dismiss Mr. Bauman's claims against Twilio, without prejudice, in the above captioned case.  (ECF #171).  During our phone call last week, you suggested that Plaintiff may now intend to bring another amended complaint against Twilio.  As we stated during that phone call, should Plaintiff do so, it is our belief that such a complaint would be void of actual evidentiary support.  The discovery record in this case contains clear evidence that Twilio is not liable under the Telephone Consumer Protection Act ("TCPA"), and the most recent documents you sent further confirm this.  We hope that you will conduct the reasonable and competent inquiry to realize that an amended complaint against Twilio, in light of the factual record, would have no basis in law or fact.  Indeed, the record developed in this proceeding demonstrates that no good faith complaint could be brought against Twilio.

The initial complaint against the Saxe Defendants was brought on July 9, 2014.  However, Twilio was not named as a defendant until Plaintiff filed the Amended Class Action Complaint ("Amended Complaint") on August 28, 2015, after almost a year of discovery had taken place.  (ECF #63).  We note that the Amended Complaint did not supplement or modify the existing allegations to uniquely support the claims against Twilio.  Rather, Plaintiff simply added Twilio's name to the list of already named defendants.  In the Amended Complaint, Plaintiff broadly alleges that "defendants

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES
MADRID • MEXICO CITY • MIAMI • MILAN • MOSCOW • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • RIYADH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

Albert H. Kirby
September 22, 2016
Page 2

sent . . . [an] unsolicited SMS or "text" message to Plaintiff[.]"  And Plaintiff claims that "defendants made these calls . . . using an "automatic telephone dialing system ('ATDS')."  However, in light of the legal requirements for TCPA liability and the discovery record at your disposal, these allegations against Twilio were, and continue to be, entirely unjustified.  You have no factual basis to support a claim against Twilio.

To state a TCPA claim against Twilio, Plaintiff must allege:  (1) that Twilio initiated the text messages that Plaintiff received, or (2) had a high degree of involvement in the making of the text.  The record in this case does not support *any* of these requirements of a TCPA claim against Twilio.

First, any allegation that Twilio initiated these text messages is entirely unjustified.  The FCC makes abundantly clear that only the initiators of calls or text messages are liable under the TCPA, "not [the party] that transmits the call or messages and that is not the originator or controller of the content of the call of the message." 47 U.S.C. § 227 (b)(1)(A).  On July 9, 2016—prior to Plaintiff's filing of the Amended Complaint—Plaintiff took the deposition of Richard Schaaf, the Internet Marketing Manager for David Saxe Productions, LLC.  (*See* ECF #109-3).  In his deposition, Mr. Schaaf testified that he had determined what contents went into the script of the text message communications that he sent on behalf of Defendant Saxe Productions, LLC—the same text communications that Plaintiff alleges to have received.  (Schaaf Dep. 55).  Mr. Schaaf made clear that Twilio did not help him to draft or design the content of the communications, but instead provided only a "sample script" on the Twilio website. (Schaaf Dep. 66).  He had the ultimate control to decide what would be included in the scripts (Schaaf Dep. 60), and he determined what phone numbers would receive the messages (Schaaf Dep. 52).  Mr. Schaaf's testimony showed that Twilio did not "initiate" text messages.

Further, Mr. Schaaf's deposition provided no evidence that Twilio exhibited "a high degree of involvement" in the making of the call, as is required to support TCPA liability where the defendant is a transmitter, and not user, of telecommunications services.  *Rinky Dink v. Elec. Merch. Sys.*, Civ. No. 13-1347-JCC, 2015 WL 778065 (W.D. Wash. Feb. 24, 2015).  On the contrary, the deposition testimony revealed evidence that Twilio was *not* at all involved in the selection of recipient phone numbers, assembly of the communication script, or timing of the message's initiation.  Indeed, Mr. Schaaf stated that he did not know much about Twilio nor what the company even does.  (Schaaf Dep. 53-60).  Further, he stated that he had limited interaction with Twilio and only spoke to a Twilio representative *on one occasion* during his time working to design the communications at issue.  (Schaaf Dep. 66).  Twilio was clearly not "highly involved" in the design or initiation of the messages.  As you know, such facts absolve Twilio of TCPA liability.  *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Declaratory Ruling and Order, 30 FCC Rcd. 7961, (rel. Jul. 10, 2015); *Kauffman v. Callfire, Inc.*, 141 F. Supp. 3d 1044, 1048 (S.D. Cal. Oct. 7, 2015) (an internet-based communication platform cannot be an

Albert H. Kirby
September 22, 2016
Page 3

"initiator" when it "requires its users to take affirmative steps to determine whether, when, and to whom they should send text messages," and its customers have to "create their own telephone contact lists").

The only allegation Plaintiff makes regarding Twilio in any of Plaintiff's pleadings is that Twilio "transmitted nearly 300,000 text messages" and that Twilio "helped by providing some of the code for each of the scripts." Plaintiff's Resp. to Mot. for Partial Summary Judgment, at 4. But during Mr. Schaaf's deposition, you directly asked him: "Twilio helped you write the script?" and Mr. Schaaf responded: "No." (Schaaf Dep., 54). In fact, Mr. Schaaf noted that part of a script is "downloadable on [Twilio's] Website" but that he did not "recall if it was their website directly or not." (Schaaf Dep., 55). Regardless, Mr. Schaaf, the user of the API services, took "affirmative steps" to design and send the messages. He stated that he used "Control C, control V" to cut and paste Twilio's portion of the script into the script he used. (*Id.*). Moreover, significant portions of his deposition reveal the large extent of his software coding, script design, personal integration, "stripping," "filling," etc. (*See generally* Schaaf Dep., 100-120).

Federal Rule of Civil Procedure 11(b)(3) requires an attorney or unrepresented party to certify "the factual contentions [contained in a pleading or motion] have evidentiary support," and Rule 11(c)(1) permits the imposition of sanctions on "any attorney, law firm, or party that violate[s] the rule or is responsible for the violation." The Ninth Circuit, and the District of Nevada, have imposed, and affirmed the imposition of, sanctions where a party, as here, provided knowingly false information in its pleadings. *See, e.g., Bus, Guides, Inc. v. Chromatic Commc'ns Enterprises, Inc.*, 892 F.2d 802, 811 (9th Cir. 1989), aff'd, 498 U.S. 533 (1991) (if a claim "provides false facts, or provides facts that the client should have known were false, then the client should be sanctioned"); *Seare v. St. Rose Dominican Health Found.*, No. 2:10-CV-02190-KJD, 2011 WL 5101972, at *2 (D. Nev. Oct. 25, 2011) (imposing Rule 11 sanctions because an attorney's filing of "an amended complaint based upon knowingly false information violates the provisions of Rule 11 and constitutes bad faith in instituting and conducting litigation").

We firmly hold that the judge's order dismissing the case against Twilio was correct. Twilio did not initiate or exert active control in the sending of the text message that Mr. Bauman claims to have received, and we maintain that any new factual claims stating otherwise could not be made in good faith. In accordance with the record in this proceeding as well as our professional obligations as attorneys, we hope that you not bring another amended complaint alleging TCPA liability against Twilio.

Albert H. Kirby
September 22, 2016
Page 4

If you have any questions or need additional information, please let us know.

Sincerely,

Michael B. Hazzard
James W. Uthmeier
Kaytlin L. Roholt
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
Mhazzard@jonesday.com

cc:     Candice Renka
        *Marquis & Aurbach*
        10001 Park Run Drive
        Las Vegas, NV 89145
        crenka@maclaw.com

        Phillip S. Aurbach
        *Marquis & Aurbach*
        10001 Park Run Drive
        Las Vegas, NV 89145
        paurbach@maclaw.com

        Joel D. Henriod
        *Lewis Roca Rothgerber Christie LLP*
        3993 Howard Hughes Parkway
        Suite 600
        Las Vegas, NV 89169
        jhenriod@lrrc.com

# Exhibit C

RICHARD SCHAAF - June 5, 2015                    1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF NEVADA

 3

 4    JEREMY BAUMAN, individually  )  Case No.
      and on behalf of all persons )  2:14-cv-01125-RFB-PAL
 5    similarly situated,          )
                                   )
 6              Plaintiff,         )
                                   )
 7    v.                           )
                                   )
 8    V THEATER GROUP, LLC; SAXE   )
      MANAGEMENT, LLC; DAVID SAXE; )
 9    DOES I through X, inclusive  )
      and ROE CORPORATIONS I       )
10    through X, inclusive,        )
                                   )
11              Defendants.        )
                              _____)
12    BIJAN RAZILOU, individually, )  Case No.
      and on behalf of all others  )  2:14-cv-01160-RCJ-PAL
13    similarly situated,          )
                                   )
14              Plaintiff,         )
                                   )
15    v.                           )
                                   )
16    V THEATER GROUP, LLC, a      )
      Nevada Limited Liability     )
17    Company; SAXE PRODUCTIONS,   )
      INC., a Nevada Corporation;  )
18    DAVID SAXE PRODUCTIONS, LLC, )  VIDEOTAPED DEPOSITION
      a Nevada Limited Liability   )  OF RICHARD SCHAAF
19    Company; SAXE MANAGEMENT,    )
      LLC, a Nevada Limited        )
20    Liability Company; DAVID     )
      SAXE, an individual,         )
21                                 )
                Defendants.        )
22    _____)

23

24

25
```

VIDEOTAPED DEPOSITION OF RICHARD SCHAAF

Taken on Friday, June 5, 2015

at 9:33 a.m.

at 10001 Park Run Drive

Las Vegas, Nevada

Reported by:  Gina J. Mendez, CCR No. 787

RICHARD SCHAAF - June 5, 2015                          3

```
 1    APPEARANCES:

 2    For the Plaintiff Jeremy Bauman:
                        ALBERT KIRBY, ESQ.
 3                      Sound Justice Law Group
                        936 North 34th Street
 4                      Suite 300
                        Seattle, Washington  98103
 5                      (206) 489-3210

 6                      CANDICE RENKA, ESQ.
                        Marquis & Aurbach
 7                      10001 Park Run Drive
                        Las Vegas, Nevada  89145
 8                      (702) 382-0711

 9    For the Plaintiff Bijan Razilou:
                        MICHAEL DEVLIN, ESQ.
10                      Strategic Legal Practices
                        1875 Century Park East
11                      Suite 700
                        Los Angeles, California 90067
12                      (310) 277-1040

13    For the Defendants:
                        KENNETH E. PAYSON, ESQ.
14                      JAMES HARLAN CORNING, ESQ.
                        Davis Wright Tremaine, LLP
15                      1201 Third Avenue
                        Suite 2200
16                      Seattle, Washington  98101
                        (206) 757-8126

17

18    Also Present:  Alexander Marks, Esq.
                      David Saxe
19

20                    I N D E X

21    WITNESS                                        PAGE
      RICHARD SCHAAF
22
      Examination by Mr. Kirby                          4
23

24                    E X H I B I T S

25                      (None marked.)
```

**Lawyer Solutions Group**
**www.lawyersolutionsgroup.com**

1      Q.  So you were involved in a text messaging program

2   for off and on for a year and your testimony is you

3   don't know whether any of the text messages were

4   actually sent?

5              MR. PAYSON:  Objection.  Asked and answered.

6   Argumentative.

7              THE WITNESS:  That is correct.

8   BY MR. KIRBY:

9      Q.  And why don't you know?

10     A.  Because I wasn't sending the text messages.

11     Q.  What were you doing?

12     A.  I was sending what I wanted to text to a

13  third-party company.

14     Q.  And what was this third-party company?

15     A.  Twilio.

16     Q.  So what would you call what you wanted to text to

17  Twilio if not a text message?

18     A.  I'm sorry, I'm confused.

19     Q.  What did you send to Twilio?

20     A.  I sent a message and a phone number.

21     Q.  So can you estimate how many messages and phone

22  numbers you sent to Twilio over the course of the text

23  messaging program?

24     A.  I cannot guess.  I cannot estimate.  I do not

25  know.

1      Q.  Did you send at least one message and telephone
2  number combination to Twilio over the course of the text
3  messaging program?
4      A.  Yes.
5      Q.  Did you send at least two message and phone
6  combinations to Twilio over the duration of the text
7  messaging program?
8      A.  I'm not sure how many were sent to Twilio.
9      Q.  Did you send at least two?
10     A.  Assuming.
11     Q.  Would you assume that you sent at least 30
12  message and telephone number combinations to Twilio over
13  the course --
14             MR. PAYSON:  Objection.  Calls for
15  speculation.
16             THE WITNESS:  I don't know how many.
17  BY MR. KIRBY:
18     Q.  So how would you find out if you were asked to
19  find out how many message and phone combinations you
20  sent to Twilio over the course of the text messaging
21  program that lasted approximately a year off and on?
22             MR. PAYSON:  Objection.  Vague as to message
23  and phone combinations.
24             THE WITNESS:  Would you mind repeating that
25  again.

1              (Record read.)

2              THE WITNESS:  I would probably call Twilio.

3    BY MR. KIRBY:

4        Q.  And why would you call Twilio?

5        A.  Because I don't know how many were sent and I

6    assume they may be.

7        Q.  Would you have any reason to distrust the

8    accuracy of Twilio's records of those message and phone

9    combinations that they received to send?

10       A.  I don't know anything about Twilio so I don't

11   know.

12       Q.  So how did you get the telephone numbers that you

13   ended up sending to Twilio as part of the text messaging

14   program?

15       A.  An agent or -- an agent would manually type that

16   phone number into the ticketing system.

17       Q.  And then what happened to the telephone number

18   next?

19       A.  If that telephone number was attached to a guest

20   that was seeing a show that day I would send that

21   telephone number with a message to Twilio.

22       Q.  And how would you do that?

23       A.  Through a script.

24       Q.  What do you mean by script?

25       A.  Script is a single file programming language

1    basically.

2        Q.   And how would you execute the script?

3        A.   Sometimes I would execute it manually, sometimes

4    I would have it on a scheduler and sometimes I wouldn't

5    execute it at all.

6        Q.   And how would you manually execute the script?

7        A.   Pushing a button.

8        Q.   And how would the --

9               THE COURT REPORTER:  How would?

10   BY MR. KIRBY:

11       Q.   How would the scheduler work to execute the

12   script?

13       A.   It pushes a button for me.

14       Q.   And how does it push a button for you?

15       A.   It's set at a certain time and it just runs.

16       Q.   And would the script retrieve just one telephone

17   number at a time?

18       A.   The script would retrieve, for lack of a better

19   term, a data set, that data set was looped upon and sent

20   one individual phone number and message to Twilio at a

21   time.

22       Q.   And how was a message added to a telephone

23   number?

24       A.   It had already resided in the script.

25       Q.   And how did the message get into the script?

```
 1        A.   I typed it.
 2        Q.   And to your knowledge what happened to a message
 3   and telephone number combination after it was sent to
 4   Twilio?
 5        A.   I don't know.
 6        Q.   How many telephone numbers was this script
 7   capable of retrieving at a given time?
 8        A.   I don't know.
 9        Q.   Could it retrieve a lot of telephone numbers?
10             MR. PAYSON:  Objection.  Vague.
11             THE WITNESS:  I don't know.
12   BY MR. KIRBY:
13        Q.   Did you write the script?
14        A.   Some of it, yes.
15        Q.   And who wrote the rest of the script?
16        A.   Twilio.
17        Q.   Twilio helped you write the script?
18        A.   No.
19        Q.   Then how did Twilio write part of the script?
20        A.   It's downloadable on their Website.
21        Q.   And did you download it from their Website?
22        A.   I don't recall if it was their Website directly
23   or not.
24        Q.   Did you put Twilio's portion of the script into
25   the script?
```

1      A.   Can you rephrase that.

2      Q.   There was a portion of script that you testified

3   that Twilio wrote; is that correct?

4      A.   Yes.

5      Q.   How did that portion of the script get into the

6   script?

7      A.   Control C, control V.

8      Q.   And who did control C and control V?

9      A.   I did.

10      Q.   And what does control C and control V mean?

11      A.   Control C would be a computer term or a short

12   term for hitting the control button and the letter C on

13   your computer and control V would be a computer short

14   term for hitting the control button and the letter V on

15   your keyboard; however, that only applies to a PC.

16      Q.   And what effect did those control C and control V

17   do, what function do those control C and control V --

18      A.   It could copy and paste.

19      Q.   So you copied and pasted a portion of the script

20   that was written by Twilio into the script?

21      A.   Can you define the word "the script," it's very

22   general.

23      Q.   Are there more than one scripts that retrieved

24   telephone numbers?

25      A.   Yes.

1      Q.   How many scripts are there?

2      A.   Good question.  I can't say for sure.  I can't

3   even guess.

4      Q.   Your attorneys produced to me three scripts.

5      A.   Okay.

6      Q.   Does three sound about right?

7      A.   I cannot guess.

8      Q.   So the telephone numbers were stored on a

9   database?

10     A.   Yes.

11     Q.   What is the nature of that database?

12     A.   It would be the -- I don't understand the word

13   "nature," can you describe that.

14     Q.   Strike the question.  What is the database those

15   telephone numbers are stored on?

16     A.   You mean like what type?

17     Q.   Yes.  Tell me what type.

18     A.   It's Microsoft SQL Server.

19     Q.   And where is that SQL server located?

20     A.   In a data center.

21     Q.   In what data center?

22     A.   I believe the name is -- I think they call

23   themselves the Zayo Group.

24     Q.   Zayo Group?

25     A.   Uh-huh.

1     Q.  And where is the Zayo Group located?

2     A.  I'm not sure of the exact address, it's by the

3  215 and Warm Springs.

4     Q.  And is that in Las Vegas?

5     A.  Yes.

6     Q.  So the server is physically located in Vegas; is

7  that correct?

8     A.  Yes.

9     Q.  And it's in the possession of what you called the

10  Zayo Group?  The Zayo Group --

11     A.  What about them?

12     Q.  They possess the server?

13     A.  Possess?

14     Q.  The server is located at a facility owned by the

15  Zayo Group; is that correct?

16             MR. PAYSON:  Objection.  Lack of foundation.

17             THE WITNESS:  I think it's correct.  I don't

18  know if you got the name right or if I got the name

19  right, but it's located in a facility.

20  BY MR. KIRBY:

21     Q.  And the facility is not owned by David Saxe

22  Productions, LLC to the best of your knowledge?

23     A.  I'm not sure.

24     Q.  Are you aware of any other data that is stored on

25  the server?

1      A.   Can you define data.

2      Q.   What do you understand data to be?

3      A.   Data could be a million things.  But pretty much

4  anything that's virtual, that is informational and

5  resides within a digital space.

6      Q.   Any other data of a guest that is stored on this

7  server?

8            MR. PAYSON:  Objection.  Vague.

9            THE WITNESS:  I still don't get what you

10 mean by any other data, can you be specific?

11 BY MR. KIRBY:

12     Q.   So there is data that is -- there's a telephone

13 number?

14     A.   Okay.

15     Q.   And the telephone numbers are data that is stored

16 on the server; is that correct?

17     A.   Yes.

18     Q.   And are guests' addresses stored on the server?

19     A.   Sometimes.

20     Q.   And what do you mean by sometimes?

21     A.   Not all guests want to give us information so it

22 wouldn't be there.

23     Q.   So what is Twilio?

24     A.   I think -- you know, I'm not sure exactly what

25 they are or how much they do.

1    Q.  To your knowledge what does Twilio do?

2    A.  I don't know what they do.

3    Q.  Do you know anything that they do?

4    A.  I think they assist in texting.

5    Q.  How do they assist in texting?

6    A.  I'm not sure.

7    Q.  Did they assist David Saxe Productions, LLC in

8  texting?

9    A.  No, I sent -- you know, I don't know.  I don't

10  know if they assisted or not.

11    Q.  Did they assist you in texting?

12    A.  Yes.

13    Q.  And how did they assist you?

14    A.  They helped me with basically setting it up.

15    Q.  And how did they help you set it up?

16    A.  Like we discussed earlier they provide sample

17  scripts that I control C and control V into something

18  that I wrote.

19    Q.  And by control C and control V you mean you copy

20  pasted something that they wrote into something you

21  wrote?

22    A.  Yes.

23    Q.  How else did Twilio assist you in texting?

24    A.  They provided me some verbiage for our terms of

25  service.

1      Q.   And what do you mean by some verbiage for your

2   terms of service?

3      A.   I don't understand what you're asking me.

4      Q.   You just used a term, I'm asking you what you

5   meant by that term.

6      A.   Which term specifically, though, is what I mean.

7      Q.   You said you were discussing there was some

8   verbiage for some terms of service.  So what do you mean

9   by when you say verbiage for some terms of service?

10     A.   They had some -- couple paragraphs of text.

11     Q.   And did you have a pre-exiting terms of service?

12     A.   Could you repeat that.

13     Q.   Did you have a pre-exiting terms of service?

14     A.   Yes.

15     Q.   And did you add their verbiage of terms and

16   service to your exiting terms of service?

17     A.   Yes.

18     Q.   And when did you do this?

19     A.   It could have been any time before the first text

20   message was attempted.

21     Q.   And where are these terms of service -- strike

22   that.

23          Where is the terms of service located?

24     A.   As far as what?

25     Q.   Where would someone find the terms of service?

1      A.   Like physically?  What do you mean?

2      Q.   Like where would -- like a guest, where would

3  they be exposed to the terms of service?

4      A.   On the Web.  When they pick their tickets up.

5      Q.   And how would they be exposed to the terms of

6  service?

7      A.   They're presented to the guest and they have to

8  accept or -- you know, I don't know what the term is,

9  but I mean they get them before they get any tickets

10 printed.

11     Q.   How do they get them?

12     A.   They see them on a computer screen.

13     Q.   How do they see them on a computer scene?

14     A.   With their eyes.

15     Q.   At what point in the process -- I'm unclear as to

16 at what point in the process of what -- strike this.

17          So focusing on the Web, at what point in a guest

18 Website interactive experience is a guest exposed to the

19 terms of service?

20     A.   Two places, upon sign-up and upon checkout.

21     Q.   And what do you mean by sign-up?

22     A.   When a guest signs up on the Website.

23     Q.   You mean like create an account?

24     A.   No, when they sign up.

25     Q.   And what happens when someone signs up?

1        A.   It creates a mini guest profile.

2        Q.   And where is this profile stored?

3        A.   In a database.

4        Q.   Is it the same database that to which you were

5   referring earlier?

6        A.   I believe it is.

7        Q.   And when you say checkout, what do you mean?

8        A.   Checkout is a generic term used on the Web for

9   when a consumer can go through the process of purchasing

10  something on some Website.  So the checkout would be

11  steps that they take to get from Point A of the

12  information, what they're buying, finishing and

13  completing the transaction.

14       Q.   So this is how someone purchasing a ticket for a

15  show would be introduced to the terms of service on the

16  Web?

17       A.   Yes.

18       Q.   You also said that guests would be presented with

19  the terms of service when they picked up their tickets,

20  what do you mean by pick up their tickets?

21       A.   Well, it's an odd question.  I mean, you go to

22  the counter and get tickets and it let's you in the

23  theater.

24       Q.   So they would pick it up at the counter of the

25  box office for say the V Theater or the Saxe Theater?

1     A.  I'm not sure if there's any other places to pick

2     up tickets, I don't know.

3     Q.  So the only places of which you're aware to pick

4     up tickets for a show at the V Theater or at the Saxe

5     Theater is at one of those two theaters?

6     A.  I think so.

7     Q.  So how are guests presented with the terms of

8     service when they pick up tickets at one of those two

9     locations?

10    A.  There's a computer monitor in the counter that

11    faces the guest and as they are interacting with the

12    agent it's presented on a screen.

13    Q.  So you have the ability to change the terms of

14    conditions that guests see when they pick up their

15    tickets at a theater box office for the V Theater or the

16    Saxe Theater?

17    A.  Yes.

18    Q.  So when we left off with how Twilio assisted you

19    with the text messaging program you mentioned -- your

20    last mention that they provided some verbiage for the

21    terms and conditions.  How else did Twilio assist you?

22    A.  I don't recall.

23    Q.  Did they facilitate the transmission of any text

24    messages for you?

25    A.  I'm unclear on that question.

```
 1      Q.  What is unclear about the question?
 2      A.  Facilitate.
 3      Q.  Have you ever heard the word "facilitate" before?
 4      A.  Yeah, but I would assume, and correct me if I'm
 5  wrong, that would be kind of like assisting.
 6      Q.  Kind of like assisting I suppose you're saying?
 7      A.  I don't know.  Is there a question?
 8          MR. KIRBY:  So can you repeat the last
 9  question that I've made.
10              (Record read.)
11          THE WITNESS:  I assume they did, I'm not
12  sure.
13  BY MR. KIRBY:
14      Q.  Did you ever speak to anyone at Twilio about the
15  text messaging program?
16      A.  Yes.
17      Q.  Who did you speak with at Twilio?
18      A.  I believe her name started with a C and I'm not
19  sure exactly what that name was.
20      Q.  And what did you speak to her about?
21      A.  It was more of a meet and greet, where do I get
22  the sample stuff and, you know, that was pretty much
23  about it.
24      Q.  How many times did you speak with her?
25      A.  Once.
```

1      Q.   Did you speak with anyone else at Twilio?

2      A.   I don't know.  I don't think so.

3      Q.   Did you ever create an account with Twilio?

4      A.   Yes.

5      Q.   For whom did you create the account at Twilio?

6      A.   For David Saxe Productions, LLC.

7      Q.   Did you create any other accounts at Twilio?

8      A.   I don't believe so.

9      Q.   Do you still have access to the account at

10   Twilio?

11     A.   I don't know.

12     Q.   How did you log in to your account at Twilio?

13     A.   Well, I would go to twilio.com, push the log in

14   button and log in.

15     Q.   And how would you log in?

16     A.   I just answered that, I pushed the log in button.

17     Q.   Did you have an account ID or password that you

18   would have to input to log in?

19     A.   Yes.

20     Q.   What was your account ID?

21          MR. PAYSON:  Objection.  You have asked that

22   through written discovery, Mr. Kirby, we've objected to

23   that.  I'm prepared to terminate the deposition and seek

24   protective order so I suggest that you move off that

25   line of questioning.  You know we objected to that, deal

1    found that information.

2        A.   Okay.

3        Q.   Let me amend that, can you point to the beginning

4    and the end of that --

5        A.   I'm trying to find the beginning.

6        Q.   Okay.   Just point to me first.

7        A.   (Witness pointing.)

8        Q.   And now where does it end?

9        A.   (Witness pointing.)

10       Q.   And that section all related to the same

11   function?

12              MR. PAYSON:   Objection.   Vague.

13              THE WITNESS:   You're going to have to define

14   function for me.

15   BY MR. KIRBY:

16       Q.   Okay.   So the information you inputted in

17   Section B -- strike this.

18            Section B as it related to other portions of the

19   script would result when the script was being run for

20   you to be sent e-mails.

21       A.   Can you ask that again, I didn't catch all of it.

22              THE COURT REPORTER:   I didn't either.

23   BY MR. KIRBY:

24       Q.   When you successfully executed this script and it

25   worked, would you typically be sent an e-mail?

**RICHARD SCHAAF - June 5, 2015**                 101

```
1        A.  Yes and no.  A lot of times it just never came.

2        Q.  What do you mean?

3        A.  I never received the e-mail.

4        Q.  Did you receive e-mails?

5        A.  Yes.

6        Q.  What happened to those e-mails?

7        A.  I don't know.

8        Q.  Did you delete those e-mails?

9        A.  No.

10       Q.  So they're still in your e-mail account
11   somewhere?

12       A.  I don't know.

13       Q.  Have you ever done a search to find those
14   e-mails?

15       A.  No.

16       Q.  Are you aware if anybody has done a search to
17   find those e-mails?

18       A.  I don't know.

19       Q.  Which e-mail account would they be in?

20       A.  Mine.

21       Q.  And which e-mail account is that?

22       A.  Ric@davidsaxe.com.

23       Q.  To your knowledge no one has deleted those
24   e-mails from that e-mail account?

25       A.  Oh, yeah.  Yeah, things have been deleted.
```

Case 2:14-cv-01123-RFB-PAL Document 103-8 Filed 11/16/16 Page 44 of 63
Case 2:14-cv-01123-RFB-PAL Document 104-8 Filed 11/30/15 Page 103 of 131

RICHARD SCHAAF - June 5, 2015                    102

1      Q.   By whom?

2      A.   Me.

3      Q.   When?

4      A.   All the time.

5      Q.   When was the last time you deleted e-mails from

6   this account?

7      A.   Before litigation.

8      Q.   And what do you mean by before litigation?

9      A.   Meaning when litigation hit I didn't delete

10  anything else.

11     Q.   So your e-mail account at ric@davidsaxe.com has

12  all the e-mails that were in it on the day that

13  litigation was filed?

14     A.   Yes.

15     Q.   Can the same be said as to

16  tickets@vtheaterboxoffice.com?

17     A.   I don't know about that.

18     Q.   Why can you not say that?

19     A.   Because I don't control that e-mail box, that

20  e-mail box is just forwarded to me.

21     Q.   Who controls that e-mail box?

22     A.   I assume IT.

23     Q.   Do you control ric@davidsaxe.com?

24     A.   No, not entirely.

25     Q.   Who controls it?

Case 2:14-cv-01225-RFB-RNW  Document 103-8  Filed 11/16/16  Page 45 of 63
Case 2:14-cv-01225-RFB-PAL  Document 100-3  Filed 11/30/15  Page 104 of 181

RICHARD SCHAAF - June 5, 2015                    103

 1        A.   I assume IT.

 2        Q.   When you delete an e-mail is it saved somewhere

 3   else afterwards?

 4        A.   I don't know.

 5        Q.   Who would know?

 6        A.   I don't know, I assume IT.

 7        Q.   So if you wanted to find out the answer to that

 8   question you would ask IT?

 9        A.   Yes.

10        Q.   So the sections between Section B and Section A

11   what do they do?

12        A.   Well, it grabs show information and starts a loop

13   over that show information.

14        Q.   And what do you mean by that?

15        A.   It's just that, it's grabbing show information

16   and looping over that information.

17        Q.   What type of show information?

18        A.   The ID and the name.

19        Q.   And what would happen after the script would grab

20   that information?

21        A.   It would move to the next line.

22        Q.   So the section we just discussed can you point to

23   me the beginning and end of that section?

24        A.   Right here and I guess it would go to here.

25        Q.   Can you circle that like we've done the other

RICHARD SCHAAF - June 5, 2015                    104

1    sections and call that Section C.

2        A.   (Witness drawing.)

3        Q.   So after Section C ended, finished what it was

4    doing it would go on to Section A?

5        A.   Yes.

6        Q.   So how would what occurred in Section C relate to

7    what happened in Section A?

8        A.   I'm unclear on that.  There's not really a

9    relation between the two so I'm unclear.

10       Q.   So -- so in Section C that script would that give

11   the user of the script an opportunity to set the start

12   time and the end time of the dates for shows that it was

13   searching for information?

14       A.   No.

15       Q.   At the bottom of Section C there's a line that

16   has CF set start date time equals, do you see that line?

17       A.   I do.

18       Q.   What does that line do?

19       A.   That is setting the date and time of that

20   particular moment.

21       Q.   So it basically when you execute the script it

22   sets the date for its parameters as that day's date?

23       A.   Yes.

24       Q.   So, for example, I were executing this script

25   today it would search for shows on this day?

Case 2:14-cv-01125-RFB-BNW Document 183 Filed 11/16/16 Page 47 of 63
Case 2:14-cv-01125-RFB-PAL Document 109-8 Filed 11/30/15 Page 106 of 181

```
 1      A.   No.

 2      Q.   If I ran the search -- if I executed the script

 3 today, what shows on what date -- strike that.

 4           If I executed this script today on -- what are

 5 the date parameters for the shows it would seek

 6 information?

 7      A.   No, no, you've got it -- either I'm confused

 8 or -- let's read that question again.

 9                     (Record read.)

10           MR. PAYSON:  Objection.  Vague.

11           THE WITNESS:  Yeah, I don't know.

12 BY MR. KIRBY:

13      Q.   So this script taken as a whole if it executes

14 successfully would it be a script that would extract

15 telephone numbers and connect them with messages that

16 were sent to Twilio?

17      A.   No.

18      Q.   If this script runs correctly what would happen?

19      A.   Well, the first thing it would do is it would

20 grab all of the show names that are published and then

21 it would loop through each show and grab like we

22 discussed e-mails, item name, selected section, a

23 guest's first name and last name, a phone number and a

24 ticket code and once it grabs this information it starts

25 a loop over the information and sends an e-mail and
```

Case 2:14-cv-01125-RFB-RNW Document 103-8 Filed 11/16/16 Page 48 of 63
Case 2:14-cv-01125-RFB-PAL Document 103-8 Filed 11/30/15 Page 107 of 131

RICHARD SCHAAF - June 5, 2015                    106

```
 1    information to Twilio.
 2        Q.  And what information would be contained in the
 3    e-mail to Twilio?
 4        A.  It doesn't send an e-mail to Twilio.
 5        Q.  What does it send to Twilio?
 6        A.  It sends a -- it sends a single phone number and
 7    a message.
 8        Q.  What is that -- can you identify -- strike that.
 9            Can you point to the section of this script in
10    which you looked at to get the answer to that last
11    question.
12        A.  Right here.
13        Q.  Can you point to the top of the section and the
14    bottom of the section.
15        A.  Right here and right here.
16        Q.  Can you circle all portions of the sections on
17    the pages that it's on and then label each circle as D.
18        A.  (Witness drawing.)
19        Q.  So how was the message and telephone number
20    transmitted to Twilio?
21        A.  Via the wire.
22        Q.  What wire?
23        A.  The cloud.
24        Q.  What cloud?
25        A.  The World Wide Web.
```

```
 1      Q.  The Internet?

 2      A.  Yes.

 3      Q.  And on what pages -- strike that.

 4          What portions of the script were the contents of

 5   the messages determined?

 6      A.  Just to be sure I got the question right can we

 7   repeat it.

 8              MR. KIRBY:  Could you please repeat it.

 9                  (Record read.)

10              THE WITNESS:  The script did not determine

11   messages.

12   BY MR. KIRBY:

13      Q.  What determined the messages?

14      A.  I did.

15      Q.  How?

16      A.  I typed it.

17      Q.  And are you referring in that regard to contents

18   of messages that are, for example, on DSPLLC 8?

19      A.  No.

20      Q.  What are you referring to?

21      A.  I'm referring to the message on DSPLLC 9.

22      Q.  So what would you type to determine what message

23   would be sent to Twilio?

24      A.  In the case of this example you are seeing a show

25   and that line.
```

```
 1      Q.   In D?

 2      A.   Yes.

 3      Q.   Would you type this line before you executed the

 4   script?

 5      A.   Sometimes.

 6      Q.   What times would you not type out this -- the

 7   contents of the message requesting this script?

 8      A.   When I wasn't executing the script.

 9           THE COURT REPORTER:  Can you repeat your

10   question, I wasn't sure if I heard the right word.

11           MR. KIRBY:  Can you read it back.

12                (Record read.)

13   BY MR. KIRBY:

14      Q.   We'll strike the question and the answer because

15   I can't remember exactly what I wrote.

16           MR. PAYSON:  Yeah, if you can't remember

17   what you said and she didn't capture --

18           MR. KIRBY:  Yeah, so can you strike the

19   previous question and answer just for everybody --

20           MR. PAYSON:  Yeah.

21   BY MR. KIRBY:

22      Q.   When you executed the script would you before

23   executing the script at some point enter any contents

24   for the text message into the script?

25      A.   Sometimes.
```

1    Q.  When would you not enter the contents of the

2    text -- strike that.

3         When would you not enter the contents of the

4    message into the script before executing the script?

5    A.  When I wasn't changing the message.

6    Q.  So once you entered the contents of a message

7    into the script you could execute it by pressing one

8    button and the same message would be used in the

9    execution of the script?

10   A.  No.

11   Q.  Why not?

12   A.  Because you're missing a piece in that and you

13   have to type it, upload it, then push the button.

14   Q.  Okay.  So looking at DSPLLC 8.

15   A.  Okay.

16   Q.  What are the contents we're looking at here?

17   A.  An e-mail.

18   Q.  An e-mail.  What type of e-mail?

19             MR. PAYSON:  Objection.  Relevance.

20             THE WITNESS:  I mean, I don't know what to

21   say, it's an e-mail.  I didn't know there was different

22   types.

23   BY MR. KIRBY:

24   Q.  To whom -- when you say this is an e-mail, was

25   this an e-mail that was sent to someone?

1      A.  Yes.

2      Q.  To whom were these e-mails sent to?

3      A.  I don't know exactly.

4      Q.  Was this part of this script?

5      A.  Yes.

6      Q.  How is it part of the script?

7      A.  Well, because it's typed in pages -- in between

8   pages 1 -- or pages 4 and pages 13.

9      Q.  So when you executed the script how was the

10  contents on this page used in relation to the execution

11  of the script?

12     A.  It's an e-mail.

13     Q.  For what purpose?

14     A.  It sends an e-mail.

15     Q.  To who?

16     A.  I don't know.

17          MR. PAYSON:  I'm just going to make a

18  continuing objection to this line of inquiry.  There are

19  no e-mail claims at issue in this lawsuit.

20  BY MR. KIRBY:

21     Q.  Were these e-mails sent in any way with the

22  assistance of Twilio?

23     A.  No.

24     Q.  Did this portion of the script in any way connect

25  to the Twilio API that was used for the text messaging

RICHARD SCHAAF - June 5, 2015          111

```
 1    program?
 2        A.   No.
 3        Q.   Was this portion in the script purpose -- strike
 4    this.
 5             Was the purpose of this portion of the script to
 6    result in e-mails that were to be directed to guests of
 7    a theater?
 8        A.   I don't know.
 9        Q.   Did you draft this portion of the script?
10        A.   Yes.
11        Q.   Why?
12        A.   To send an e-mail.
13        Q.   Why?
14             MR. PAYSON:  I'm going to object again on
15    relevance.  I gave you a lot of latitude.  This is
16    really going far afield from the text messaging at issue
17    in this lawsuit.  He's established it has nothing to do
18    with the Twilio account, this is not a license to commit
19    fishing expedition into defendant's other activities.
20    I've given you a fair amount of leeway.
21             I'll let you ask one more e-mail question
22    and if you persist then I'm prepared to terminate this
23    deposition and seek a protective order and instruct the
24    witness not to answer.  If you wish to go down that
25    path, we can do that.
```

1            MR. KIRBY:  Ken, this document was produced

2    by you and your cohort as part of -- as a comprehensive

3    response to what was used in the transmission of the

4    text messages.

5            MR. PAYSON:  Because it contains the

6    responsive information with respect to text messages.

7    So I suggest you ask questions about the text messaging

8    portions.  My objection stands, you know what I'm

9    prepared to do, I've given you a lot of latitude.

10           MR. KIRBY:  Ken, you do know that in

11   Satterfield and in Papa John's two fairly prominent

12   cases related to text messaging TCPA litigation, one

13   reviewed by the Ninth Circuit and one by the -- well,

14   the distinguished Judge Cunha (phonetic) in Western

15   District of Washington, those involved text messaging

16   programs in which e-mails were sent as part of the text

17   messaging, are you aware of that?

18           MR. PAYSON:  I am aware we're here -- that

19   this witness has testified that the text messaging and

20   e-mail had nothing to do with Twilio.

21           And in Papa John's were there e-mail

22   allegations?

23           MR. KIRBY:  Yes.

24           MR. PAYSON:  And are there e-mail

25   allegations in this case, Mr. Kirby?

Case 2:14-cv-01123-RFB-RNW Document 103-8 Filed 11/16/16 Page 55 of 63
Case 2:14-cv-01123-RFB-PAL Document 109-3 Filed 11/30/16 Page 154 of 181

RICHARD SCHAAF - June 5, 2015                    113

1            MR. KIRBY:  Strike that.  We're trying to

2    figure out what -- how things work and one way that

3    things typically work oftentimes is that people sending

4    text messages send them, initiate -- at some part of the

5    process they use e-mails.

6            So I don't know, I mean your witness is not

7    very responsive here to a lot of these questions, not

8    very elaborative, I'm trying to draw them out.  If you

9    want to confer with your witness so that he can give us

10   a fret conversation of what this really is it can save

11   us a lot of time.

12           MR. PAYSON:  Mr. Kirby, you don't need to

13   get in -- I think some of the problem is that you're not

14   framing very good questions.  My witness is doing the

15   best he can to answer your questions.  My objection is

16   stated, this lawsuit doesn't have any allegations of any

17   wrongful conduct with respect to e-mails.

18           I've given you a lot of latitude, you're

19   wasting my time, you're wasting the witness's time and I

20   told you I'll give you -- you can ask another e-mail

21   question; but otherwise, I'm prepared to terminate this

22   deposition and seek protective order and if you force me

23   to do that as I said before we're not bringing that

24   witness back.

25           So if you have other questions you want to

1    ask I suggest you do it now; otherwise, if you insist on

2    pursuing down this line I will instruct the witness not

3    to answer, I will terminate the deposition and will seek

4    protective order.

5              MR. KIRBY:  Okay.  And we will note how much

6    time you're wasting here.  So would you like to go off

7    the record to talk informally to try to resolve some of

8    this?

9              MR. PAYSON:  Sure.

10             MR. KIRBY:  Can we go off the record.

11                  (Short recess taken.)

12   BY MR. KIRBY:

13      Q.  Mr. Schaaf, we're back on the record.  Are you

14   aware that your testimony remains under oath?

15      A.  Yes.

16             MR. KIRBY:  When we were on break we

17   discussed with regard to the exhibits that we're using

18   the exhibits from yesterday's deposition of David Saxe

19   for today's deposition, those exhibits will not be

20   attached to today's deposition, but they will be

21   attached to David Saxe's deposition and that's how we'll

22   try to do it going forward until we otherwise decide not

23   to do it that way.

24             MR. PAYSON:  We're agreeable to that.

25   BY MR. KIRBY:

1      Q.  So, Mr. Schaaf, I would like you to look at

2  DSPLLC 4 through DSPLLC 13 which is the script that we

3  were discussing before the break.  Could you take your

4  pen and put brackets around on either side of each

5  section that has anything to do with the text message

6  program.

7              MR. PAYSON:  Can we pause for a second.  Do

8  you want to go off the record?

9              MR. KIRBY:  Off the record.

10             (Discussion held off record.)

11 BY MR. KIRBY:

12     Q.  Back on the record.  Mr. Schaaf, you're still

13 under oath.

14     A.  Yes.

15     Q.  Can you bracket and star each section of this

16 script that has no relationship whatsoever to the text

17 message program?

18     A.  How would you like me to bracket, like big or a

19 start bracket and end bracket?

20     Q.  A start bracket and end bracket around -- on

21 either side like on this side and that side.

22     A.  (Witness drawing.)

23             And just so I'm correct here I'm bracketing and

24 starring things that are not relevant to text messaging?

25     Q.  That has no connection whatsoever to the text

1    message program whether it's getting information,

2    accessing the database from which numbers were

3    extracting or sending you confirmations when text

4    messages were sent or anything like that.

5        A.   Okay.

6         (Witness drawing.)

7        Q.   On either side?

8        A.   Well, there's going to be a few pages here.

9        Q.   Can you bracket like the whole side of it so

10   there's a big bracket on the side of the page and on

11   either side.

12       A.   (Witness drawing.)

13        And once again I'm bracketing anything that has

14   nothing to do with related to text messages?

15       Q.   In any fashion directly or indirectly.  So if it

16   were wholly related to an e-mail only program as an

17   example.

18       A.   I think I got it.

19       Q.   And, Mr. Schaaf, we've been shuffling some

20   papers, can you go through the exhibit and make sure

21   everything is in order, every page is there and make

22   sure your brackets and stuff are correct.

23       A.   I made a small clerical error so this bracket

24   needs to stop here.

25       Q.   So what are you referring to?  Just for the

```
 1    record, are you referring to the top of DSPLLC 4 where
 2    you made a revision to the top of your topmost bracket
 3    there?
 4        A.   Yes.
 5        Q.   And you're allowing for the top line of code to
 6    have some relationship to the text messaging program?
 7        A.   Yes.
 8        Q.   And just to establish the bracketed portions of
 9    this script code what did they relate to?
10        A.   The bracketed portions of this script relate to
11    things not relevant to text.
12        Q.   But what did they relate to?  I'm just trying to
13    establish that.
14        A.   I might be confused.  They don't relate to things
15    for text.
16        Q.   Do they relate to anything?
17        A.   Yes.
18        Q.   What do they relate to?
19        A.   E-mail.
20        Q.   So they relate only to e-mail marketing, not to
21    text message marketing?
22        A.   They relate only to e-mail.
23        Q.   What type of e-mails?
24        A.   Once again I didn't know there was different
25    types, it's e-mail.
```

Case 2:14-cv-01125-RFB-PAL   Document 103-8   Filed 11/16/16   Page 60 of 63
Case 2:14-cv-01125-RFB-PAL   Document 103-8   Filed 11/30/15   Page 119 of 131

RICHARD SCHAAF - June 5, 2015                    118

1           MR. KIRBY:  No need for protective order or
2    anything like that?
3           MR. PAYSON:  I haven't made an objection
4    since we got back from break.
5           MR. KIRBY:  Okay.
6    BY MR. KIRBY:
7      Q.  You just shortened this deposition, thank you.
8           So Section C, again, what did that do?
9      A.  Section C grabs the name of the show of any --
10   Section C deals with show information.
11     Q.  And it's gathering information related about some
12   shows?
13     A.  Yes, that's correct.
14     Q.  And what is Section A?
15     A.  Section A is gathering information from I guess
16   guests.
17     Q.  What type of information?
18     A.  An e-mail, the item name, the section that they
19   were sitting in, the guest's first name and the guest's
20   last name, a phone number and the ticket that was used
21   or the voucher that was used.
22     Q.  And is the telephone number gathered by this
23   portion of the script at Section A the phone number that
24   would eventually be forwarded to Twilio in connection
25   with a message?

```
 1        A.   It sounded like you asked me two questions.  This
 2   section is gathering a data set of information that I
 3   will parse through and send individually one by one to
 4   Twilio.
 5        Q.   And that information that would be sent would be
 6   the telephone number that's part of the information
 7   gathered by Section A?
 8        A.   Yes.
 9        Q.   So can you point to the beginning -- strike that.
10             Can you circle the next section of the script.
11        A.   (Witness drawing.)
12        Q.   And can you mark the next section of the script
13   E.
14        A.   (Witness drawing.)
15        Q.   What does Section E do?
16        A.   Section E will look for the particular ticket
17   that was used and will also look at the particular
18   seating section that may or may not be used from the
19   guest.
20        Q.   And how does this section relate to the text
21   messaging program?
22        A.   If the -- I guess the easiest way for me to
23   explain it would be if the guest was already sitting in
24   a premium seat there's no way to relet them know about
25   that option.
```

1        Q.   So, for example, it would screen to make sure if

2   someone had a VIP seat it wouldn't send a message

3   offering a VIP seat upgrade?

4        A.   You are correct, but it's more of a premium seat,

5   not a VIP seat.

6        Q.   An upgrade of one sort or another, if someone

7   already had an upgrade it would screen to make sure they

8   would not send a message offering the upgrade they

9   already have?

10       A.   No, an option.

11       Q.   An option?

12       A.   Yes.

13       Q.   So if they already elected to have an option,

14   they already paid for it, it wouldn't send them a

15   message related to that option?

16       A.   Yes.

17       Q.   So skipping to DSPLLC 9, Section D --

18       A.   Okay.

19       Q.   -- that runs over to the next page.  Just for

20   clarity sake what does Section D do?

21       A.   I don't know in its entirety.

22       Q.   Can you please review.

23       A.   It does many things so I think we should speak at

24   it in different parts.

25       Q.   So Section D has its own subsections?

```
 1   numbers of customers?
 2       A.  I don't know for sure.
 3       Q.  When this program was executed was it intended
 4   that messages here would be forwarded to Twilio?
 5       A.  Yes.
 6       Q.  And when they are forwarded to Twilio they would
 7   be sent in connection with a telephone number of a
 8   customer?
 9       A.  I'm losing it.  Can you repeat that for me.
10                   (Record read.)
11           THE WITNESS:  Yes, one at a time.
12   BY MR. KIRBY:
13       Q.  Can you please circle the next section of the
14   script that relates in any way to the text messaging
15   program.
16       A.  (Witness drawing.)
17       Q.  And can you please mark that as D.
18       A.  (Witness drawing.)
19       Q.  What does Section D do?
20       A.  Sends me an e-mail.
21       Q.  And what would be the contents of the e-mail?
22       A.  The record count, start date time and end date
23   time.
24       Q.  Can you please collect the pages of that exhibit
25   together and make sure they're in order.
```