**Sound Justice Law Group, PLLC**
Albert H. Kirby
*Admitted Pro Hac Vice*
936 N. 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 489-3210
Facsimile: (866) 845-6302
ahkirby@soundjustice.com

**Marquis Aurbach Coffing**
Phillip S. Aurbach
Nevada Bar No. 1501
Candice E. Renka
Nevada Bar No. 11447
10001 Park Run Drive
Las Vegas, Nevada 89145
Telephone: (702) 382-0711
Facsimile: (702) 856-8943
paurbach@maclaw.com
crenka@maclaw.com

Counsel for Plaintiff Jeremy Bauman

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| JEREMY BAUMAN, individually and on behalf of all persons similarly situated, | Case No.  2:14-cv-01125-RFB-PAL |
| Plaintiffs, | |
| vs. | **PLAINTIFF JEREMY BAUMAN'S RESPONSE IN OPPOSITION TO DEFENDANT TWILIO INC.'S MOTION FOR SANCTIONS** |
| DAVID SAXE, et al, | |
| Defendants. | |
| BJIAN RAZILOU, individually, and on behalf of all others similarly situated, | In consolidation with Case No. 2:14-cv-01160-RFB-PAL |
| Plaintiff, | |
| vs. | |
| V THEATER GROUP, LLC, et al. | |
| Defendants. | |

1

2

**TABLE OF CONTENTS**

I.   INTRODUCTION ..........................................................................................................1

II.  STATEMENT OF FACTS .........................................................................................1

III. ARGUMENT .............................................................................................................4

    A.   The Applicable Legal Standard................................................................4

    B.   By Failing to Serve Plaintiff With a Full Copy of Its Motion for

        Sanctions, Defendant Failed to Satisfy Rule 11's Jurisdictional Safe

        Harbor Requirement, Which is Strictly Construed.............................................5

    C.   Twilio Is Liable Under the TCPA.............................................................7

        1.   Twilio is Liable Under the 2015 FCC Order.........................................7

        2.   Twilio is Independently Liable Under Vicarious Liability

            Doctrine.........................................................................................13

    C.   Twilio Used an ATDS.................................................................................13

    D.   The TCPA is a Remedial Statute That Is Construed Broadly to Protect

        Consumers from Automated Text Messages Being Sent to Their Cellular

        Telephones...................................................................................................17

    E.   Defendant's Improper Motion for Sanctions is Itself Subject to Rule 11 .......18

IV.  CONCLUSION ..........................................................................................................19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.     INTRODUCTION

In accord with the case management orders of this Court, the parties have not yet begun discovery on the merits of their claims and defenses. Nevertheless, asserting Rule 11, Defendant Twilio, Inc. brings a motion for sanctions against Plaintiff Jeremy Bauman. Twilio essentially argues that Plaintiff's claims are futile. Twilio would deny Plaintiff with the opportunity to conduct merits discovery to prove his case. Twilio errs.

Twilio wrongly uses its Rule 11 motion for sanctions to bypass the obstacles it faces in prevailing on a Rule 12 motion to dismiss or a Rule 56 motion for summary judgment when merits discovery has not even commenced. Twilio thus uses its motion for sanctions improperly as a tool for harassment and intimidation. Twilio also attempts to use its motion for sanctions to create a false narrative of the facts that underlie Plaintiff's claims against it. If sanctions are to be given to any party, then sanctions should be levied upon Twilio for the improprieties advanced by its motion.

At an earlier hearing in this case, the Court itself suggested that facts subsequently alleged in Plaintiff's amended complaint could support Plaintiff's claims against Twilio. Documentary evidence obtained from other defendants substantiate Plaintiff's claims, too. Twilio conspicuously ignores such realities to argue a fiction. Plaintiff respectfully asks that the Court reject Twilio's wrongful efforts and deny the motion. If any sanctions are to be levied, then Plaintiff respectfully requests that the Court levy them on Twilio. Plaintiff should be permitted the opportunity to conduct merits discovery to reveal the full scope of evidence that supports Plaintiff's claims against Twilio and its co-defendants.

## II.     STATEMENT OF FACTS

At a hearing of multiple motions on September 6, 2016, the Court heard and granted Twilio's motion to dismiss Plaintiff Jeremy Bauman's initial claims against it. *See* Dkt. #180 (transcript of hearings), pp. 16:25 – 17:3. However, the dismissal was without prejudice, and the Court granted leave to Plaintiff to file an amended complaint against Twilio. *See id.* The Court indicated that it granted leave to amend in part because there were facts supporting Plaintiff's claims presented in other motions that were not contained in Plaintiff's then complaint. *See id.*, p. 6:12-19. For example, the Court noted that there were facts presented by Plaintiff outside the complaint which provided "indication that essentially Twilio either participated or assisted in, in

terms of developing script or code, with the transmittal and initiation of messages." *See id.*, p. 12:22-25. The Court suggested that such facts seemed to establish that an amended complaint as to Twilio would not be futile. *See id.*, p. 13:2-3 ("Why wouldn't that be enough, at least for me to find that amendment wouldn't be futile?"); p. 14:8-11 ("But it seems to me that if there is an allegation potentially that Twilio worked together with the Saxe defendants in terms of developing the code necessary to initiate the calls, why wouldn't that be enough?"). Thus, in refusing to grant Twilio's request for a dismissal with prejudice, the Court seemed to indicate that, at a minimum, Plaintiff's claims against Twilio were neither frivolous nor futile.  *See id.*, pp. 16:25 – 17:3.

On September 20, 2016, Plaintiff filed his amended complaint against Twilio. *See* Dkt. #174 (Second Amended Complaint). Plaintiff took heed of the Court's instructions. In the amended complaint, Plaintiff made clear with his allegations that he received several telemarketing text messages that were sent by Twilio. *See id.*, ¶¶ 33-41. Twilio sent such text message advertisements to many thousands of different cellular telephone numbers using its transmission equipment. *See id.*, ¶¶ 43-44. Twilio sent these text message advertisements after it collaborated with the other defendants (the "Saxe Defendants") "to develop, implement, and maintain [a] telemarketing text message program." *See id.*, ¶ 52. To facilitate Twilio's transmission of so many text messages, "Twilio joined their software and hardware together [with that of the Saxe Defendants] to create, sort, and send hundreds of thousands of text message advertisements to cellular telephone numbers in an automated manner." *See id.*, ¶ 53. For each of the many text messages sent, "Twilio then caused its devices to store the telephone numbers and messages, prioritize in what sequence the text messages would be sent to the various cellular telephone carriers [of] each telephone number, and ensured that the text messages were not blocked by cellular telephone carriers as telemarketing spam." *See id.*, ¶ 55. "Twilio controlled when and how each of the telemarketing text messages was delivered to the cellular telephone numbers of their intended recipients." *Id.*, ¶ 56.

Plaintiff's amended complaint filed on September 20, 2016 also alleged, "In addition to helping the Saxe Defendants to transmit all of [these] telemarketing text messages, Twilio

provided other material support to the text message telemarketing program." *See* Dkt. #174, ¶ 57. "In direct communications between representatives of Twilio and [agents of the Saxe Defendants], Twilio provided [the Saxe Defendants] with software code tailored for [the Saxe Defendants'] devices to enable and facilitate the automated transmission of telemarketing text messages with the assistance of Twilio." *See id.*, ¶ 58. *"*Representatives of Twilio provided help and advice to [the Saxe Defendants] on how to ensure their telemarketing program would not run afoul of spam filters of cellular telephone carriers that are intended to block such uninvited telemarketing." *See id.*, ¶59. "Representatives of Twilio helped [the Saxe Defendants] obtain a short code telephone number for the telemarketing program to aid in bypassing the spam filters of cellular telephone carriers." *See id.*, ¶ 60. "Representatives of Twilio helped [the Saxe Defendants] generate communications for customers of the Saxe Defendants about the telemarketing program." *Id.*, ¶ 61. "Twilio even assigned [the Saxe Defendants] a mobile marketing campaign specialist who was specifically authorized by Twilio to ensure that the telemarketing text message program was a success." *See id.*, ¶ 62. Accordingly, "[t]he telemarketing text message program could not have worked without the knowledge, authorization, approval, ratification, participation, and/or active support of Twilio." *Id.*, ¶ 63. As made clear in the Second Amended Complaint, Twilio was not a mere, guileless conduit of the illegal text message advertisements. *See supra*.

To date, the Court has limited discovery in this action to class certification matters. *See*, *e.g.*, Dkt. #35, p. 6. Accordingly, Plaintiff has not yet begun discovery on the merits of his claims. *See id.* Nevertheless, Plaintiff has obtained documents from the Saxe Defendants which support the factual allegations against Twilio in Plaintiff's Second Amended Complaint. *See Declaration of Albert H. Kirby* ("*Decl. Kirby*"), ¶ 2, Exs. 1-3. From these documents, it appears that Twilio had at least three employees who were assigned to ensure that the telemarketing campaign was a success. *See id.* For example, a Twilio employee responsible for the Saxe Defendants' "Customer Success" in "Mobile Marketing" provided specific code to use and provided instructions on how "[t]o circumvent carrier scrutiny of […] long code messaging traffic." *See id.*, Ex. 1, pp. 1-2. Through this employee, Twilio evinced knowledge of exactly

what the telemarketing text messaging scheme entailed and found that "[t]he way [the Saxe Defendants] are leveraging mobile to send out targeted promotions is pretty amazing[.]" *See id.*, Ex 1, p. 1. When merits discovery begins, Plaintiff anticipates that depositions of these three employees together with other discovery likely will yield more evidence that support Plaintiff's claims and undermines Twilio's defenses. *See id*, ¶ 2.

On September 16, 2016, Twilio's counsel engaged in a telephone conference with Plaintiff's counsel to dissuade Plaintiff from filing the Second Amended Complaint with claims against Twilio. *See Decl. Kirby*, ¶ 3. Twilio's counsel indicated that a claim filed against Twilio would be considered by Twilio to be against its business model and thereby would be defended aggressively. *See id.* Plaintiff's counsel understood Twilio's counsel to be threatening a lot of motions and other effort to make pursuing claims against Twilio not worth the resources and risk that Plaintiff and his counsel would expend and incur. *See id.* As Twilio's counsel was relatively new to the case and had substituted counsel that had withdrawn, Plaintiff's counsel attempted to educate Twilio in broad strokes as to facts, including Twilio's own emails produced by the Saxe Defendants in discovery, that make it seem likely that merits discovery will support Plaintiff's claims. *See id.* At that time, Twilio's new counsel indicated that he had not yet received Twilio's complete file from Twilio's former counsel and therefore did not yet have all the materials mentioned by Plaintiff's counsel. *See id.* As a courtesy, Plaintiff's counsel promptly forwarded additional copies of some discovery materials to Twilio's counsel and provided guidance about needing to get additional documents directly from Twilio's co-defendants. *See* Dkt. #183, Ex. A. These courtesies were not essential. Through its prior counsel, Twilio had had available all discovery exchanged between the parties since the year prior. *See Decl. Kirby*, ¶ 3.

It is in this context that Plaintiff filed his Second Amended Complaint with claims against Twilio. The claims are neither legally nor factually baseless.

## III.   ARGUMENT

### A.   The Applicable Legal Standard

When, as here, the challenged pleading is a complaint, a court "must conduct a two-prong

1   inquiry to determine (1) whether the complaint is legally or factually baseless from an objective

2   perspective, and (2) if the attorney has conducted a reasonable and competent inquiry before signing and

3   filing [the complaint]."  *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir.2005) (quoting *Christian v.*

4   *Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir.2002).  Therefore, a court may only find a complaint is

5   "frivolous" and in violation of Rule 11 if it is "'***both*** baseless ***and*** made without a reasonable and

6   competent inquiry.' "  *Id.* (quoting *Moore v. Keegan Mgmt. Co.*, 78 F.3d 421, 434 (9th Cir.1996)

7   (emphasis added).  The inquiry requirement is satisfied if there is "***any*** factual basis for [an] allegation."

8   *Brubaker v. City of Richmond*, 943 F.2d 1363, 1377 (4th Cir.1991) (emphasis added).

9         Defendant has fallen far short of demonstrating that Plaintiff's complaint lacks "any factual

10  basis."  To the contrary, and as explained in greater detail below, Plaintiff's allegations all state viable

11  theories of recovery.  Moreover, by pursuing and obtaining discovery from Twilio's co-defendants before

12  filing claims against Twilio, Plaintiff made a reasonable and competent inquiry. *See supra*.

13        **B.      By Failing to Serve Plaintiff With a Full Copy of Its Motion for Sanctions, Defendant**

14                **Failed to Satisfy Rule 11's Jurisdictional Safe Harbor Requirement, Which is**

15                **Strictly Construed**

16        Rule 11's safe harbor provision requires that a "movant serve[] the allegedly offending party

17  with a ***filing-ready motion*** as notice that it plans to seek sanctions."  *Truesdell v. S. California*

18  *Permanente Med. Grp.*, 293 F.3d 1146, 1151 (9th Cir. 2002) (emphasis added); Fed. R. Civ. P. 11 ("A

19  motion for sanctions must be made separately from any other motion and must describe the specific

20  conduct that allegedly violates Rule 11(b).  ***The motion*** must be served under Rule 5….") (emphasis

21  added).  "Notably, courts find that failure to 'serve a copy of the ***full motion*** that will be filed with the

22  Court' does not satisfy the safe harbor provision."  *MetLife Bank, N.A. v. Riley*, No. 3:10-CV-00122-

23  ECR, 2010 WL 4024898, at *3 (D. Nev. Oct. 13, 2010) (quoting *Truesdell v. S. California Permanente*

24  *Med. Grp.*, 293 F.3d 1146, 1151 (9th Cir. 2002)) (emphasis added).

25        Defendant did not serve a full, filing-ready version of its Motion on Plaintiff.  In the

26  subsequently-filed version of its Motion (ECF/CM Doc. No. 183), Defendant includes the following

27  parenthetical citation in support of its argument that Plaintiff purportedly "fil[ed] a meritless Second

28  Amended Complaint against Twilio…." (Mot. at 10:22-23):

1   *Wick v. Twilio Inc.*, No. C16-00914RSL, 2016 WL 6460316, at \*4 (W.D. Wash. Nov. 1,

2   2016) (dismissing plaintiff's first amended complaint against Twilio, and warning that

3   plaintiff may file a second amended complaint only if he "believes he can, *consistent with*

4   *his Rule 11 obligations*, amend the complaint to remedy the pleading and legal

5   deficiencies" (emphasis added)).

6   (Mot. at 10:24-11:1.)

7       This passage, however, is completely absent from the "safe harbor" version of the Motion

8   Defendant served on Plaintiff on or around October 26, 2016.  Having departed from the "safe harbor"

9   version of the motion, Defendant's Motion is defective on its face.[1]

10      Defendant is expected to argue that (1) *Wick* was published only after the service of its "safe

11  harbor" motion and (2) the omission of the parenthetical citation is, in any event, a *de minimis* violation

12  of Rule 11.  These arguments, however, are irrelevant under Rule 11.  The safe harbor provision is no

13  mere formality; the Ninth Circuit makes clear that courts should strictly enforce the safe harbor

14  provision.  *See Holgate v. Baldwin*, 425 F.3d 671, 678 (9th Cir. 2005).  "…[T]he procedural

15  requirements of Rule 11(c)(1)(A)'s 'safe harbor' are mandatory …. It is the service of the motion that

16  gives notice to a party and its attorneys that they must retract or risk sanctions … " *Radcliffe v. Rainbow*

17  *Const. Co.*, 254 F.3d 772, 789 (9th Cir. 2001) (holding that district court abused its discretion in ignoring

18  defendant's failure to comport with the strict terms of Rule 11).  The strict enforcement of Rule 11's safe

19  harbor provision serves Rule 11's notice function; the moving party must provide no less than full and

20  complete notice of its motion to the non-moving party.  *See id.*  (the fact that plaintiffs have advance

21  warning that a defendant objects to their allegations does not cure the defendant's failure to comply with

22  the strict procedural requirement of Rule 11(c)(1)(A)).

23      Accordingly, it is irrelevant that *Wick* was published only after Defendant's "safe harbor" motion

24  was served.  If Defendant had genuinely wished to have the merits of its Motion heard, Defendant ought

25  to have corrected its motion and then served the amended version on Plaintiff, thereby restarting the safe

26  harbor period.  In its haste to file the Motion, however, Defendant ignored the safe harbor requirements.

27

28      [1] Perhaps recognizing that the served version of its Motion fails to comport with Rule 11,
    Defendant has not included it, or the "safe harbor" letter to which it was attached, as an exhibit to its
    Motion—despite including other materials that purport to support its position. *Cf. Decl. Kirby*, ¶ 4 Ex. 4.

1    Moreover, even if Defendant had referenced *Wick v. Twilio* outside of its "safe harbor" motion, such as

2    during the parties' meet-and-confer call—which it did not—its instant Motion would nevertheless be

3    defective and jurisdictionally-barred.  Again, no less than serving an amended motion would have

4    sufficed.

5        **C.    Twilio Is Liable Under the TCPA**

6            1.    Twilio is Liable Under the 2015 FCC Order

7    Defendant claims that Twilio cannot be held liable under the TCPA because "[t]he FCC has

8    made abundantly clear that only the initiators of calls or text messages are liable under the TCPA, 'not

9    [the party] that transmits the call or messages and that is not the originator or controller of the content of

10   the call of the messages.' 47 U.S.C. § 227 (b)(1)(A)."  (Mot. at 6:18-22.)[2]  None of Defendant's cited

11   authority, however, supports this "initiator" argument.

12   For example, Defendant cites *Rinky Dink v. Elec. Merch. Sys.* for the proposition that a "'high

13   degree of involvement' in the making of the calls … is required to support TCPA liability where the

14   defendant is merely a transmitter of communications."  (Mot. at 7:17-22.)  *Rinky Dink*'s "high degree of

15   involvement" standard is inapplicable here, however, because it is expressly limited to the conduct of

16   common carriers: "***A common carrier*** may be held liable for the unlawful activities of its users if it is

17   found that the carrier: (1) exercised a high degree of involvement with the unlawful activity, or (2) had

18   actual notice of an illegal use of its services."  *Rinky Dink, Inc. v. Elec. Merch. Sys.*, No. C13-1347-JCC,

19   2015 WL 778065, at *7 (W.D. Wash. Feb. 24, 2015), *appeal dismissed* (Mar. 6, 2015), *appeal dismissed*

20   (Aug. 24, 2015), *motion to certify appeal granted*, No. C13-1347-JCC, 2015 WL 11234154 (W.D.

21   Wash. Mar. 24, 2015) (emphasis added).  In other words, a common carrier is ordinarily immune from

22

23   [2] Defendant is making a claim about the FCC's position on liability under the TCPA.  In support
     of that claim, Defendant purports to quote the TCPA directly—specifically, 47 U.S.C. 227(b)(1)(A).
24   Yet, nowhere in the text of the TCPA does the quoted passage appear.  A mis-attribution error in an
     ordinary, non-dispositive motion is serious enough, but in a Motion for Sanctions—where, among other
25   types of relief, Defendant seeks to strike Plaintiff's claims—it is fatal.  Nor is this an isolated defect.  As
     explained above, Defendant has also served a defective "safe harbor" motion on Plaintiff.  These two
26   defects—alone and in combination—undermine Rule 11's notice functions.  *See Holgate*, 425 F.3d at
     677 ("The 1993 Amendments to Rule 11 … place stringent notice and filing requirements on parties
27   seeking sanctions.").
         Moreover, any attempt by Defendant to correct this error in a notice of errata or on reply would
28   only serve to exacerbate its violation of Rule 11's safe harbor provision.  The "safe harbor" version of the
     Motion also contains this error.  If Defendant retroactively attempts correct it, the corrected version
     would then necessarily deviate from the "safe harbor" version—all in violation of Rule 11.

liability under the TCPA, but if it exercised a high degree of involvement with the illegal activity or had actual notice of an illegal use of its services, it cannot take advantage of that immunity. *Id.* at *7. Therefore, *Rinky Dink* is not a test of liability of non-common carriers.

Defendant is not a common carrier. Indeed, Defendant's reliance on *Rinky Dink* is particularly troubling because Defendant has previously ***admitted that it is not a common carrier***, and is estopped from claiming to the contrary. To wit, on November 20, 2015, Twilio filed a Petition Seeking a Declaratory Ruling Clarifying the Regulatory Status of Mobile Messaging Services, arguing that text messaging services (of the kind Twilio provides) "must be treated as a common carrier service." (*See* RJN Ex. 2 at pp. 11-14.) This effectively concedes that Twilio is not currently a common carrier. Accordingly, *Rinky Dink* is wholly irrelevant here.

Plaintiff is unaware of any ruling on the Defendant's Petition to the FCC. However, the FCC already answered the essential arguments made by Defendant. In a declaratory ruling earlier this year, the FCC made clear that a calling platform's mere involvement in the physical transmission of automated text messages can indicate liability for making or initiating a call in violation of the TCPA.

> As a result, the Commission has concluded that the determination as to who is liable as the person who "makes" or "initiates" a particular robocall (including an autodialed text message) requires a fact-based determination governed by factors such as which party takes the "steps necessary to physically place" that call and the extent and nature of involvement by others, including the provider of the calling platform used to make that call.

*In re Rules & Regs. Impl'g the Tel. Consumer Prot. Act of 1991* ("*2016 FCC Order*"), 31 F.C.C. Rcd. 88 ¶ 8 (Jan. 11, 2016). Thus, the FCC concludes that a party involved in "tak[ing] the 'steps necessary to physically place' [a] call" can be liable under the TCPA even if it is that party's business to broadcast such calls for others. *See id*.

Defendant also cites *Kauffman v. Callfire, Inc.* for the proposition that an "internet-based communication platform cannot be an 'initiator' when it 'requires its users to take affirmative steps to determine whether, when, and to whom they should send text messages,' and its customers have to

'create their own telephone contact lists[.]'" (*See* Mot. at 8:8-13.)  Yet, the "affirmative steps" and "create their own contact lists" factors are only relevant to common carriers.  *See Kauffman v. CallFire, Inc.*, 141 F. Supp. 3d 1044, 1047 (S.D. Cal. 2015) (finding that "[a] carrier is not entitled to this exemption [from TCPA liability] if it 'was so involved in placing the call as to be deemed to have initiated it'" and concluding that Defendant Callfire is a carrier that did not initiate the messages plaintiff received).

As noted above, however, Defendant has admitted that it is not a common carrier.  Accordingly, the carrier liability triggered by the "affirmative steps" and "create their own contact lists" provisions simply do not apply here.

Finally, Defendant argues that the FCC's 2015 Declaratory Ruling and Order ("2015 Order") supports its "high degree of involvement" argument.  (*See* Mot. at 8:1-8.)  Not so.  The 2015 Order decided the "involvement" issue in the context of end-user apps, not in the context of third-party companies that undertake complex, large-scale telemarketing campaigns on behalf of corporate clients (like the Saxe Defendants):

> Next, we clarify who makes a call under the TCPA and is thus liable for any TCPA violations.  We grant, to the extent described herein, YouMail's Petition and clarify that it does not make or initiate a text when ***an individual*** merely uses its service to set up auto-replies to incoming voicemails.[]  By contrast, we deny Glide's Petition and find that, in at least one scenario, it is the maker or initiator of text messages inviting consumers appearing in its ***app user's*** contacts lists to use the Glide app.[]  We grant TextMe's Petition, and clarify that TextMe does not make or initiate a call when one of the ***app users*** sends an invitational message using its app.[]
>
> [¶]
>
> Commenters supporting the Petitioners argue that merely providing software or a platform that facilitates calling, or hosting a calling service, is not a TCPA violation;[] that ***user*** choice and involvement in sending text messages is the element that causes the ***app provider*** to cease to be the maker of the call;[] and that operators of platforms do not initiate calls, but rather ***users of the apps*** do.[]  Opposing commenters argue that where

9

the transmission service provider is highly involved with the calling, it should be held

liable as the maker of the call;[] and the ***app developer*** does not merely facilitate the call

but rather makes the call when it creates and sends pre-written text messages without the

app user's authorization, knowledge, or interaction.[]

(2015 Order ¶¶ 25 and 28, emphases added; *and see id.* ¶¶ 31-36.)  Moreover, the FCC  subsequently

made clear that the mere involvement in the physical transmission of automated text messages can

indicate liability for making or initiating a call in violation of the TCPA. *See 2016 FCC Order*, 31 F.C.C.

Rcd. 88 ¶ 8.

As the FCC makes clear, the petitions considered in the 2015 Order (*i.e.*, the YouMail, Glide,

and TextMe petitions) concern the relationship between end-users and app developers.  (*See, e.g.*, 2015

Order ¶ 32 ["YouMail is a reactive and tailored service; in response to a call made to the app user,

YouMail simply sends a text message to that caller, and only to that caller.  This kind of service differs

from the non-consensual calling campaigns over which the TCPA was designed to give consumers some

degree of control."]; *id.* ¶ 34 ["While Glide does not make clear in its Petition or comments all the ways

consumers can use its app, we find that, in at least one scenario, Glide is the maker or initiator of the text

and thus liable for TCPA violations."]; *id.* ¶ 37 ["TextMe acknowledges that the language of the

invitational texts has varied over time, but is clear that it, and not the app user, controls the content of the

invitational text message."].)

Because the YouMail, Glide, and TextMe petitions involved end users, they necessarily

presented facts that are not at issue here.  In YouMail, for instance, the FCC concluded that "YouMail

does not make or initiate a call when one of its [individual] app users uses its service to send an

automatic text in response to a voicemail left by someone who called the YouMail app user." (2015

Order ¶ 31.)  In Glide, the FCC concluded that Glide "is the maker or initiator of text messages inviting

consumers appearing in its app user's contacts lists to use the Glide app." (*Id.* ¶ 25.)  And in TextMe,

"app users invite[d] their friends to use TextMe 'via text message by engaging in a multi-step process in

which users ha[d] to make a number of afrirmative choices throughout the invite process.'" (*Id.* ¶ 36.)

These facts differ as a matter of kind from those here.

Yet, even assuming for the sake of argument that the "involvement" factor is applicable to non-

end user cases, the 2015 Order makes clear that Defendant was "highly involved" in the sending of the text messages.

> [A] "direct connection between a person or entity and the making of a call" can include "tak[ing] the steps necessary to physically place a telephone call."[] It also can include being "so involved in the placing of a specific telephone call" as to be deemed to have initiated it.[] Thus, we look to the totality of the facts and circumstances surrounding the placing of a particular call to determine: 1) who took the steps necessary to physically place the call; and 2) whether another person or entity was so involved in placing the call as to be deemed to have initiated it, considering the goals and purposes of the TCPA.[] In discussing below how these standards apply in the context of factual circumstances presented in petitions before us, we identify factors that are relevant to the *DISH Declaratory Ruling* analysis. Depending upon the facts of each situation, these and other factors, such as the extent to which a person willfully enables fraudulent spoofing of telephone numbers or assists telemarketers in blocking Caller ID, by offering either functionality to clients, can be relevant in determining liability for TCPA violations.109 Similarly, whether a person who offers a calling platform service for the use of others has knowingly allowed its client(s) to use that platform for unlawful purposes may also be a factor in determining whether the platform provider is so involved in placing the calls as to be deemed to have initiated them.[]

(2015 Order ¶ 30.)

As a threshold matter, Defendant does not deny that it "physically place[d]" the text messages. Nor does Defendant deny that Plaintiff alleged that (1) Defendant transmitted nearly 300,000 text messages and that (2) Defendant providing some of the code for each of the scripts. (*See* Mot. at 8:22-24.) Therefore, even under Defendant's (erroneous) interpretation of the 2015 Order, these allegations are more than sufficient to state an actionable claim against Defendant. *Also see 2016 FCC Order*, 31 F.C.C. Rcd. 88 ¶ 8.

In sending the telemarketing text messages to Plaintiffs, Twilio caused its automated dialing devices "to store the telephone numbers and messages, prioritize in what sequence the text messages

would be sent to the various cellular telephone carriers [of] each telephone number, and ensured that the text messages were not blocked by cellular telephone carriers as telemarketing spam." (See ECF/CM Doc. No. 174, ¶ 55.) "Twilio controlled when and how each of the telemarketing text messages was delivered to the cellular telephone numbers of their intended recipients." (*Id.* ¶ 56.) Such control or involvement in determining the timing or manner of sending the text messages to Plaintiff provides additional reasons to find that Twilio was highly involved in the sending of the text messages. *See, e.g.*, *Keim v. ADF Midatlantic, LLC*, No. 12-80577-CIV, 2015 WL 11713593, at *6 n. 8 (S.D. Fla. Nov. 10, 2015) ("But to the extent their argument can be construed as an assertion that the people submitting their friends' cell phone numbers to Songwhale were the makers of the text messages Keim complains of, the Court rejects that argument because Keim pleads that those people had no control or involvement in the timing, manner, or content of the text messages.").

Moreover, Twilio provided additional material support that evinces its control and involvement in the transmission of illegal telemarketing text messages to Plaintiffs and numerous other consumers. (*See* ECF/CM Doc. No. 174, ¶ 57.) Twilio provided the other defendants with customized software code to enable and facilitate the telemarketing text message transmission scheme. (*See id.* ¶ 58.) Twilio actively helped the text message advertisements to avoid spam filters that would have otherwise prevented consumers like Plaintiff from receiving the unsolicited telemarketing. (*See id.* ¶¶ 59-60.) Twilio generated communications for the intended recipients of the text messages about the text messaging scheme. (*See id.* ¶ 61.) Twilio even designated at least one mobile marketing specialist to ensure that the telemarketing text message scheme was a success. (*See id.* ¶ 62.) "The telemarketing text message program could not have worked without the knowledge, authorization, approval, ratification, participation, and/or active support of Twilio." (*Id.* ¶ 63.) In short, Twilio enabled, facilitated, initiated, and otherwise made the text message transmissions to Plaintiff. (*See id.* ¶ 64.) Twilio's cooperation, knowledge, approval, authorization, ratification, participation, and active support were essential prerequisites to the spam text messages being sent to Plaintiff. (*See id.*)

These allegations make it plausible that discovery will substantiate that Twilio "was so involved in placing [each] call as to be deemed to have initiated it, considering the goals and purposes of the TCPA."

(*See* 2015 Order ¶ 30.)[3]

### 2.    Twilio is Independently Liable Under Vicarious Liability Doctrine

Separately, "the FCC has clarified that vicarious liability is imposed 'under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers.'" *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 878 (9th Cir. 2014) *cert. granted on other grounds*, 135 S.Ct. 2311 (2015), *citing In re Joint Petition Filed by Dish Network, LLC* ("*2013 FCC Order*")*,* 28 FCC Rcd. 6574, 6574 (May 9, 2013).  In this regard, a person "may be liable for violations by its representatives under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification."  *See 2013 FCC Order*, 28 FCC Rcd. at 6584 ¶ 28.  The Ninth Circuit defers to the FCC's declaratory ruling on vicarious liability.  *See Gomez*, 768 F.3d at 878 ("Because Congress has not spoken directly to this issue and because the FCC's interpretation was included in a fully adjudicated declaratory ruling, the interpretation must be afforded *Chevron* deference.").  And the FCC continues to affirm the applicability of its expansive approach to vicarious liability under the TCPA. *See 2015 FCC Order*, 30 FCC Rcd. at 7989 n. 96.  Thus, keeping in mind the purposes of the TCPA, more than one person can be liable for the illegal transmission of telemarketing text messages. *E.g.*, *see id.*, at 7977 ¶ 23 ("We also find that parties cannot circumvent the TCPA by dividing ownership of dialing equipment.").

Plaintiff alleges that "Twilio and the Saxe Defendants acted as agents of each other in enabling, facilitating, initiating, creating, and otherwise making the text message transmissions to Plaintiffs. The cooperation, knowledge, approval, authorization, ratification, participation, and/or active support of the Saxe Defendants and Twilio was essential prerequisite to the text messages being sent to Plaintiffs."  (ECF/CM Doc. No. 174 [Consolidated Complaint, cited as Cons. Comp.] ¶ 64.)  This is more than adequate to state an actionable claim under vicarious liability doctrine.

### C.    Twilio Used an ATDS

Defendant contends that "Plaintiff did not—and cannot—sufficiently allege that Twilio used an ATDS."  (*See* Mot. at 9:8-9.)  This contention ignores applicable authority.

The requirements for an actionable allegation of the use of an ATDS generally follow one of two

---

[3] Even so, a "Plaintiff need not prove as much at this stage of the proceedings."  *See Thomas v. Dun & Bradstreet Credibility Corp.*, No. CV1503194BROGJSX, 2015 WL 4698398, at *6 (C.D.Cal. Aug. 5, 2015) (denying motion to dismiss a TCPA claim).

approaches.  *See Maier* 2013 WL 3006415, at *3.  The <u>first</u> approach permits minimal allegations regarding use of an ATDS, in recognition of the fact that at the pleadings stage, the defendant likely has sole knowledge of the type of equipment it used to place the "call" in dispute, and will therefore only come to light once discovery has been undertaken. *Id.*  Under this approach, the allegation of receipt of a text message, along with the allegation that this message was sent by a machine with the capacity to store and produce random telephone numbers, has been sufficient to plead a defendant's use of an ATDS. *Id.*; *see also Iniguez v. The CBE Group*, 969 F. Supp. 2d 1241, 1247-48 (E.D. Cal. 2013) (alleging that "Defendant used an automatic telephone dialing system" is "sufficient on its own to support Plaintiff's claims [with respect to Defendant's use of an automatic dialing system." ).  "While additional factual details about the machines might be helpful, further facts are not required to move beyond the pleading stage." *Maier*, 2013 WL 3006415, at *3.

Plaintiff satisfies the standards of this first approach.  He alleges Defendant sent her a text message using an ATDS—a machine with the capacity to store and produce random telephone numbers. (Cons. Compl.] ¶¶ 6, 33-40, 53-65, 87.)  *See also Maier*, 2013 WL 3006415, at *3 ("Plaintiff's Complaint alleges both that she received a 'call' in the form of a text message and that an ATDS, with the functional capacity required by the statute, placed this message, thereby satisfying the first approach as described above.").

The <u>second</u> approach has been that a TCPA plaintiff must go beyond using statutory language alleging the defendant's use of an ATDS and must include factual allegations about the "call" within the complaint allowing for a reasonable inference that an ATDS was used. *Id.*  "With respect to the use of an automatic telephone dialing system ('ATDS'), which is defined as equipment with the capacity to store or produce numbers to be called using a random or sequential number generator, 'neither section 227(b)(1)(A)(iii) nor Federal Rule of Civil Procedure 8 requires Plaintiff to plead his claim with particularity.' []  Rather, courts consider whether, 'read as a whole, the complaint contains sufficient facts to show that it is plausible that Defendants used [an ATDS].'" *Mashiri v. Ocwen Loan Servicing, LLC*, No. 3:12-CV-02838-L-MDD, 2013 WL 5797584, at *4 (S.D. Cal. Oct. 28, 2013); *see also Robbins*, 2013 WL 2252646, at *3 ("'The issue is whether the allegations of the complaint, taken as a whole and including the nature of the communication, give rise to a plausible belief that the message was

---

14

sent using an ATDS.'") (quoting *Gragg v. Orange Cab Co., Inc.,* 2013 WL 195466, at *2 n.3 (W.D. Wash. Jan.17, 2013)). "'Plaintiffs alleging the use of a particular type of equipment under the TCPA are generally required to rely on indirect allegations, such as the content of the message, the context in which it was received, and the existence of similar messages, to raise an inference that an automated dialer was utilized.  Prior to the initiation of discovery, courts cannot expect more.'"  *Robbins*, 2013 WL 2252646, at *3  (quoting *Gragg v. Orange Cab Co., Inc.*, 2013 WL 195466, at *2 (W.D. Wash. Jan.17, 2013)); *Hickey*, 887 F. Supp. 2d at 1129-30  ("[C]ourts have noted 'the difficulty a plaintiff faces in knowing the type of calling system used without the benefit of discovery' and found that courts can rely on details about the call to infer the use of an ATDS.").  The following are examples of indirect factual allegations supporting a reasonable inference of use of an ATDS: (1) generic content of a message; (2) impersonal advertising content of a text message received from a particular sender with no reason to contact the plaintiff; and (3) generic content and automatic generation of the message.  *Maier*, 2013 WL 3006415, at *3.

Plaintiff satisfies the standards of this second approach as well.  He alleges that (i) "DSP and Twilio joined their software and hardware together to create, sort, and send hundreds of thousands of text message advertisements to cellular telephone numbers in an automated manner (Cons. Compl. ¶ 53); (ii) "Twilio then caused its devices to store the telephone numbers and messages, prioritize in what sequence the text messages would be sent to the various cellular telephone carriers to which each telephone number, and ensured that the text messages were not blocked by cellular telephone carriers as telemarketing spam (*id.* ¶ 55); (iii) "Twilio controlled when and how each of the telemarketing text messages was delivered to the cellular telephone numbers of their intended recipients" (*id.* ¶ 56); (iv) "In addition to helping the Saxe Defendants to transmit all of their telemarketing text messages, Twilio provided other material support to the text message telemarketing program" (*id.* ¶ 57); (v) "In direct communications between representatives of Twilio and DSP, Twilio provided DSP with software code tailored for DSP's devices to enable and facilitate the automated transmission of telemarketing text messages with the assistance of Twilio" (*id.* ¶ 58); (vi) "Representatives of Twilio provided help and advice to DSP on how to ensure their telemarketing program would not run afoul of spam filters of cellular telephone carriers that are intended to block such uninvited telemarketing" (*id.* ¶ 59); (vii)

1   "Representatives of Twilio helped DSP obtain a short code telephone number for the telemarketing

2   program to aid in bypassing the spam filters of cellular telephone carriers (*id.* ¶ 60); (viii) "Altogether,

3   the devices used by Defendants to send text messages to Plaintiffs had the capacity to store lists of

4   telephone numbers and to dial telephone numbers from such lists in an automated manner. Such capacity

5   was integral to the devices' actual ability to send numerous text messages en masse" (*id.* ¶ 65).

6        Courts repeatedly hold that allegations analogous to the ones Plaintiff makes here are adequate

7   under the second approach. *See, e.g.*, *Maier*, 2013 WL 3006415, at *4 (finding plaintiff's ATDS

8   allegation satisfied the second approach because she "supplement[ed] her ATDS allegation with a factual

9   allegation of the specific content of the text message and the number from which it was received[,]" and

10  because "the generic and impersonal content of the message support[ed] the reasonable inference of use

11  of an ATDS."); *Robbins*, 2013 WL 2252646, at *3 ("Here, Plaintiffs allege numerous text messages

12  received without prior consent, sent nationwide and en masse via SMS, promoting Coke Zero and other

13  Coke products. . . . These allegations, though indirect, suffice to plead the use of an ATDS in connection

14  with Plaintiffs' TCPA claims.") (internal citations omitted); *In re Jiffy Lube Intern., Inc., Text Spam

15  Litig.,* 847 F.Supp.2d 1253, 1260 (S.D. Cal.2012) ("Plaintiffs have stated that they received a text

16  message from an SMS short code and that the message was sent by a machine with the capacity to store

17  or produce random telephone numbers. While additional factual details about the machines might be

18  helpful, further facts are not required to move beyond the pleading stage.  It is possible that further

19  litigation will determine that no ATDS was used, but the complaint has pleaded enough facts 'to raise a

20  right to relief above the speculative level."); *Kazemi v. Payless Shoesource Inc.*, No. C 09-5142 MHP,

21  2010 WL 963225, at *2 (N.D. Cal. Mar. 16, 2010) ("[P]laintiff's description of the received messages as

22  being formatted in SMS short code licensed to defendants, scripted in an impersonal manner and sent en

23  masse supports a reasonable inference that the text messages were sent using an ATDS.  This is

24  sufficient to meet federal pleading requirements."); *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165,

25  1171 (N.D. Cal. 2010) ("However, read as a whole, the complaint contains sufficient facts to show that it

26  is plausible that Defendants used such a system.  Kramer described messages from SMS short code

27  77893, a code registered to B2Mobile. The messages were advertisements written in an impersonal

28  manner. Kramer had no other reason to be in contact with Defendants."); *Hickey,* 887 F. Supp. 2d at

1    1130 (finding "Plaintiff's allegation regarding the generic content and automatic generation of the

2    message [was] sufficient to infer the use of an ATDS[,]" and that "Plaintiff ha[d] . . . provided sufficient

3    detail to make a plausible claim under the TCPA and to allow for discovery of further evidence related to

4    Voxer's ATDS functionality.").

5         In short, Plaintiff alleges sufficient facts to support his ATDS claim.

6         **D.     The TCPA is a Remedial Statute That Is Construed Broadly to Protect Consumers**

7              **from Automated Text Messages Being Sent to Their Cellular Telephones**

8         Congress found that consumers "considered automated or prerecorded telephone calls,

9    regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy[.]"

10   *In re Rules & Regs. Impl'g the Tel. Consumer Prot. Act of 1991* ("*2012 FCC Order*"), 27 FCC Rcd.

11   1830, 1839 ¶ 24 (Feb. 15, 2012), *citing* 137 Cong. Rec. H11307 (Daily Ed. Nov. 26, 1991).  Such calls

12   to cellular telephones are even more annoying because consumers carry their cellular telephones with

13   them everywhere.  *See Riley v. California*, 134 S.Ct. 2473, 2490 (2014) ("According to one poll, nearly

14   three-quarters of smart phone users report being within five feet of their phones most of the time, with

15   12% admitting that they even use their phones in the shower.").  To prevent uninvited calls is why

16   Congress enacted the TCPA.  *See Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 268 (3d Cir. 2013)

17   ("Congress passed the TCPA to protect individual consumers from receiving intrusive and unwanted

18   calls."), *citing Mims v. Arrow Fin. Servs., LLC*, 132 S.Ct. 740, 745 (2012).

19        The provisions of the TCPA are construed broadly to benefit consumers because the TCPA is a

20   remedial statute. *See Gager*, 727 F.3d at 271 ("Because the TCPA is a remedial statute, it should be

21   construed to benefit consumers."); *cf. Hason v. Med. Bd. of California*, 279 F.3d 1167, 1172 (9th Cir.

22   2002) (affirming the "familiar canon of statutory construction that remedial legislation should be

23   construed broadly to effectuate its purposes"), *citing Tcherepnin v. Knight,* 389 U.S. 332, 336 (1967); *see

24   also In re Rules & Regs. Impl'g the Tel. Consumer Prot. Act of 1991* ("*2015 FCC Order*"), 30 FCC Rcd.

25   7961, 7974 ¶ 15 (July 10, 2015) (construing a TCPA definition broadly because "Congress intended a

26   broad definition"), *citing* Comment of Albert H. Kirby at 1, *citing Gager*, 727 F.3d at 271.

27        If Plaintiff for some reason is unsuccessful with his claims against Twilio, compounding

28   sanctions upon a dismissal would chill and disincentive other consumers from seeking to obtain their

remedies under the TCPA. Rule 11 should not be allowed to be a tool with which corporations can use to hammer consumers who attempt to vindicate their rights. Just as any doubts as to whether the TCPA applies should be resolved in favor of consumers like Plaintiff, doubts as to whether sanctions should issue from pursuing such rights also should inure in favor of consumers like Plaintiff who attempt to vindicate the remedial purposes of the TCPA and consumers protection statutes like it. Consumers have enough disadvantages in trying to vindicate their rights against corporate business enterprises under consumer protection statutes. Rule 11 should not be added to that list.

      **E.**      **Defendant's Improper Motion for Sanctions is Itself Subject to Sanctions**

Defendant's instant Motion is a paradigmatic example of a Rule 11 motion filed for improper motives, and bears all the hallmarks of an improper sanctions request.

In this case, Defendants' motion for sanctions seemingly violates many, if not all, of the Advisory Committee's admonitions on the improper uses for a motion filed under Rule 11: the motion undeniably argues the theory of Defendants' case; and it could easily be seen as a device to test the legal sufficiency or efficacy of allegations in the pleadings because the very relief it seeks is to strike claims made in the complaint against the various defendants. Defendants certainly are entitled to challenge the sufficiency of MetLife's evidence through a motion for summary judgment once MetLife has had the opportunity to conduct discovery. As the Advisory Committee makes perfectly clear, however, a motion for sanctions is not the proper mechanism through which a party may permissibly conduct such an inquiry.

*MetLife Bank, N.A. v. Badostain*, No. 1:10-CV-118-CWD, 2010 WL 5559693, at *10 (D. Idaho Dec. 30, 2010) (emphasis in original).  *And see Gaiardo v. Ethyl Corp.,* 835 F.2d 479, 484 (3d Cir.1987) ("The growing tendency to extend the Rule beyond its text and intent concerns us, as does the noticeable increase in unjustified requests for sanctions. The Rule is being perverted when used as a tool for harassment rather than as an instrument to prevent abuse."); *E. Gluck Corp. v. Rothenhaus,* 252 F.R.D. 175, 179 (S.D.N.Y.2008) (denying fees in opposing motion for sanctions but stating that "in many respects the motion [for sanctions] is grounded on matters that go to the merits of the parties' dispute" and "[i]n the Court's assessment, under these circumstances [the] Rule 11 motion teeters as close as it can

approach, without crossing over, to the borderline of being sanctionable itself").

Defendant's Motion was filed for improper motives: it fails to strictly comply with Rule 11's safe harbor provision; it advances arguments that are not warranted by existing law (*e.g.*, asserting that rules applicable only to common carriers are applicable to Defendant, who is admittedly not a common carrier); it is devoted to arguing the theory of Defendant's case; it was filed without affording the Court an opportunity to hear its Motion to Dismiss, which raises virtually the same as its Motion for Sanctions; and it serves as a device to test the legal sufficiency or efficacy of allegations in the pleadings because the very relief it seeks is to strike claims made in the complaint against Defendant (*see* Mot. at 11:18-19 [seeking dismissal of Plaintiff's claims against Twilio with prejudice].)  This evinces a lack of good faith.

"As under former Rule 11, the filing of a motion for sanctions is itself subject to the requirements of the rule and can lead to sanctions [and] ... under the revision the court may award to the person who prevails on a motion under Rule 11—whether the movant or the target of the motion— reasonable expenses, including attorney's fees, incurred in presenting or opposing the motion."  Rule 11 Advisory Committee Notes 1993 Amendments.  *See also Bond v. American Medical Ass'n*, 764 F. Supp. 122, 126 n. 3 (ND IL 1991) (if filed for improper tactical purposes, the sanctions motion may result in sanctions against the moving party).

Accordingly, Plaintiff seeks expenses and attorney fees incurred in connection with Defendant's non-colorable Motion.

**IV.     CONCLUSION**

For the foregoing reasons, Plaintiff respectfully asks the Court to deny Twilio's motion in its entirety.

RESPECTFULLY SUBMITTED:            December 5, 2016

*/s/   Albert H. Kirby*
Albert H. Kirby
Admitted Pro Hac Vice
**SOUND JUSTICE LAW GROUP, PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103

and

Phillip S. Aurbach
Nevada Bar No. 1501
Candice E. Renka
Nevada Bar No. 11447
**MARQUIS AURBACH COFFING**
10001 Park Run Drive
Las Vegas, Nevada 89145

*Counsel for Plaintiff Jeremy Bauman*

PLAINTIFF BAUMAN'S RESPONSE IN OPPOSITION TO DEFENDANT TWILIO INC.'S MOTION FOR SANCTIONS

1

**CERTIFICATE OF SERVICE**

2        I certify that the foregoing document is filed or will be filed through the Court's ECF

3    system and thereby will be sent electronically to the registered participants identified on the

4    Notice of Electronic Filing on today's date.

5    DATED: December 5, 2016                      */s/ Albert H. Kirby*
                                                  Albert H. Kirby

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28